Ronnie Lee CONN, Appellant,

v.

STATE of Missouri, Respondent.

No. 15994.

Missouri Court of Appeals,
Southern District,
Division One.

May 1, 1989.

Elizabeth Clarke, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Ronnie Lee Conn ("movant") appeals from an order denying his motion under Rule 27.26, Missouri Rules of Criminal Procedure (18th ed. 1987),[1] to vacate his conviction of two counts of first degree murder, § 565.003, RSMo 1978,[2] and concurrent sentences of life imprisonment. The conviction and sentences resulted from pleas of guilty entered June 5, 1986.

Relief was denied in the 27.26 proceeding after the circuit court, henceforth referred to as "the motion court," conducted a hearing at which movant and the State presented evidence.

To grasp the import of movant's complaints in this appeal it is necessary to know the circumstances under which his pleas of guilty were entered. Movant was originally charged by indictment with two counts of capital murder, § 565.001, RSMo 1978 (since repealed), for which the only authorized punishment on each count was either death or imprisonment during one's natural life without eligibility for probation or parole until he had served a minimum of 50 years of his sentence. § 565.008.1, RSMo 1978 (since repealed). Trial began on those charges Monday, June 2, 1986, with the prosecuting attorney announcing the State was seeking the death penalty. Three days were consumed in voir dire, culminating in the selection of a "death qualified jury."

The next morning movant appeared in the trial court with his attorneys, Public Defender Patrick Deaton and Assistant Public Defender Elise Branyan, and presented a written plea agreement stating that the following promises had been made to movant in exchange for his proposed pleas of guilty: "A sentence of life imprisonment on each of two counts of first degree murder in robbery in violation of § 565.003 RSMo, concurrent.... No probation...." The agreement was signed by movant, attorney Deaton and the prosecutor.

The prosecutor, with movant's consent, filed a two-count information in substitution of the indictment. The first count of the information charged movant with first degree murder in that he killed Viola M. Blades by striking her on or about June 16, 1984, such killing being committed in the perpetration of the felony of robbery. The second count charged movant with first degree murder in that he killed Willard A. Blades by burning him on or about June 16, 1984, such killing being committed in the perpetration of the felony of robbery. After extensive questioning by the trial court movant entered a plea of guilty to each

---

1. Rule 27.26 was repealed effective January 1, 1988. Missouri Rules of Court (19th ed.1988), p. 142. Movant's action continues to be governed by former Rule 27.26, as movant's sentences were pronounced prior to January 1, 1988, and his motion to vacate such sentences was pending prior to January 1, 1988. Rule 24.035(*l*), Missouri Rules of Criminal Procedure (19th ed.1988).

2. Section 565.003, RSMo 1978, was repealed by Laws 1983, H.C.S.S.C.S.S.B. 276, pp. 922–31. The effective date of the repeal was October 1, 1984. Laws 1984, S.C.S.S.B. 448, pp. 754–58.

count and received the sentences now under attack.

Movant commenced the instant proceeding by filing a pro se motion. Movant later filed a "Supplement Memorandum" to the motion, and at the outset of the evidentiary hearing in the motion court movant's lawyer dictated into the record certain "additional grounds" for relief. In this opinion we consider only the grounds on which movant bases his lone assignment of error. It reads:

"The [motion] court clearly erred in denying [movant's] postconviction motion to vacate [movant's] guilty plea and remand this case for trial because [movant] was denied his right to effective assistance of counsel ... in that [movant] professed his innocence of the crime of murder during two years of pretrial imprisonment, his motion and testimony show his confusion as to the elements of the plea agreement he signed, and his plea of guilty was recited because his attorneys assured him of a death sentence and therefore such plea was coerced and involuntary."

Three witnesses testified at the evidentiary hearing in the motion court: movant, attorney Deaton and attorney Branyan. The two attorneys testified at the behest of the State.

Attorney Deaton recounted that during the period when movant's case was pending in the trial court his (Deaton's) research indicated that in a death penalty trial the presentation of a not guilty defense increased the chance that if the accused were found guilty he would be sentenced to death. Deaton explained, "I discussed ... with [movant] ... that if a person either takes the stand or by presentation of a defense in effect denies to the jury, that he [committed] the murders, the experience of other attorneys has been that it's more than likely that a jury will give a death sentence in that kind of case for the reason that the accused was not remorseful and the jury may even feel that the accused or at least his defense was lying to the jury."

Deaton added, "I advised [movant] of that in talking with him about preparation of his defense so that he was fully aware of the risks."

Attorney Branyan testified, "Just a few days before trial there had been some plea negotiations and the final offer had been a plea to first degree murder with two concurrent life sentences." Movant, who had been jailed some 23 months awaiting trial, rejected the offer.

Movant testified that one of the witnesses he had told his attorneys to contact in preparation for trial was Ben Henderson. Deaton testified he had talked to Henderson, a prison inmate, prior to trial, and had arranged for Henderson to be brought from the Department of Corrections to the county jail to be available as a witness for movant at trial.

Deaton recounted that after the jury selection had been completed on the third day of trial the prosecutor informed him that if Henderson testified, he was going to say that while he (Henderson) was in jail movant had admitted to him that he (movant) had killed the Bladeses. Deaton testified he immediately interviewed Henderson, who "confirmed what the Prosecutor had told me." That is, said Deaton, Henderson would testify that movant admitted killing the Bladeses.

Deaton promptly informed movant about Deaton's conversation with Henderson, and reminded movant about the plea bargain tendered by the State. Deaton then went to his office and, along with Branyan, began preparing for the next day in court.

Movant, during cross-examination in the motion court, conceded he knew at the end of the third day of his trial that a jury had been selected from "a death qualified panel," and that the prosecutor was seeking the death penalty. Movant also acknowledged he had known all along that it would be the jurors' decision as to whether he would die, and that it was a possibility he would die if the jury sentenced him to death. Movant admitted Deaton told him,

at the end of the third day of trial, that Henderson, if called to testify, would relate conversations with movant in which movant admitted participating in the deaths of the Bladeses. Movant also recalled Deaton saying that Henderson would testify that movant had tried to get Henderson to lie about what movant had told Henderson.

Movant testified that about eight o'clock on the evening of the third day of trial (some four hours after Deaton had informed movant as to what Henderson's testimony would be), movant requested the jailers to phone his attorneys and inform them he wanted to plead guilty.

Upon receiving the call Deaton and Branyan went to the jail and conferred with movant. We henceforth refer to that meeting as "the Wednesday night conference." Asked what they discussed, Deaton replied:

> "I talked with [movant] again about what the evidence was.... I advised him to take the state's offer and told him how that would happen, you know, what would go on in court if he wanted to do that.
>
> Q. Now, with regard to your advice to him that he should take the state's offer did you consider the fact that it was a possibility that he might receive the death penalty if he continued and persisted in his not guilty defense?
>
> A. Yes. Because of the nature of the killings in this case and my experience in other death penalty cases I thought that this was the kind of case that a jury would more than likely give the death penalty.
>
> Q. And those—without getting into a lot of the details in the case, but it did involve the killing of [movant's] aunt and uncle at a time when property was taken from the aunt and uncle's home, is that correct?
>
> A. Yes, and there were other aggravating factors involved, including that there would be allegations of torture, that the Blades or at least one of them had been set on fire while they were still alive, aggravating factors like that

that made this a horrible double homicide. Very different from a shooting as a result of a quarrel or something that could be explained as the heat of the moment.

> Q. How old were the Blades, the victims in this robbery?
>
> A. They were not young. I can't remember their exact ages, but I think they were in their sixties."

During cross-examination by movant's lawyer the following dialogue occurred:

> "Q. ... Mr. Deaton, ... did you make a recommendation to [movant] that he enter a plea of guilty and accept the plea bargain?
>
> A. Yes.
>
> Q. And did you indicate to him that if it went to trial you thought he would be convicted?
>
> A. My recommendation was based in light of what the state was seeking, the penalty that the state was seeking, in light of what the plea bargain was, in light of what the evidence was. It was my recommendation that he ought to plead guilty.
>
> Q. All right.
>
> A. But I thought it was my duty to convey that to him. He always maintained that he wanted a trial and therefore I prepared the case for trial."

Movant seizes upon a comment allegedly made by attorney Branyan as evidence that his pleas of guilty were "coerced and involuntary." Movant testified that at the end of one day during trial his lawyers were at the jail "trying to get me to accept a plea agreement." It is unclear from movant's testimony whether he was referring to the Wednesday night conference. Movant testified: "Elise Branyan folded her arms and turned around and looked at me and she says, 'Ronnie, I don't want to see you die.'"

Branyan testified that at the Wednesday night conference movant indicated he wanted to plead guilty "if the plea bargain was still open." Branyan continued:

"It was our attitude by that point that were [sic] in the third day of trial, we were ready to try the case, we had talked to a majority of the witnesses, we were preparing opening, we had deposed the important witnesses, we had gone to two different states to talk to the witnesses, that we really didn't care at that point if he plead or not.

Prior to trial certainly we had encouraged him to consider taking the plea. We thought there was a substantial chance that if he went to trial and he lost the jury would impose the death penalty. But once we started trial we were ready to try it. Well, prior to trial we were ready to try it, but certainly in the middle, after three days of voir dire, we were ready to go and certainly had no intention of forcing him or telling him he had to plead guilty at that juncture."

On cross-examination Branyan was asked whether she had told movant before the trial started that he should plead guilty. She answered: "Not that he should plead guilty but he should certainly consider the offer. It was an alternative to going to try [sic] and potentially getting the death penalty."

Asked whether she told movant he should plead guilty during the Wednesday night conference, Branyan replied: "I don't believe we told him to plead guilty that night. We left it as his decision. In fact when we went to see him in the jail I don't really believe we knew for certain that the offer was still open. I believe we went back to the office after we talked to [movant] and called [the prosecutor] I think at home and asked him if there was still an offer at all."

Asked whether she remembered a conversation where she told movant "Ronnie, I don't want to see you die," Branyan responded: "I could well have said that. I don't dispute that."

In denying relief the motion court found, among other things, that each plea of guilty was made freely, voluntarily, intelligently, and with full understanding of the charges, the right to trial, and the consequences of pleading guilty, that movant stated facts under oath at the time his pleas were entered which permitted a finding that he was guilty of the charges beyond a reasonable doubt, that movant was not denied effective assistance of counsel and in fact received effective assistance of counsel in the trial court, that movant's allegations in the 27.26 proceeding were unsupported by the evidence, and that movant had failed to establish any ground for relief.

Movant's assignment of error, quoted earlier, sets forth three averments in support of his contention that he was denied effective assistance of counsel: (1) movant professed his innocence of the crime of murder during two years of pretrial imprisonment, (2) his motion and testimony show his confusion as to the elements of the plea agreement, and (3) his pleas of guilty were recited because his attorneys assured him of a death sentence.

■ As to averment "(1)" we find no explanation in movant's brief as to how that demonstrates ineffective assistance of counsel. The fact that movant persisted in his pleas of not guilty to two counts of capital murder, for each of which, had he pled guilty, his punishment could have been only death or imprisonment during his natural life without eligibility for probation or parole until he had served a minimum of 50 years of his sentence, does not demonstrate that movant's lawyers rendered ineffective assistance when movant decided to accept the State's offer to plead guilty to two counts of first degree murder, the punishment for each of which was imprisonment during his natural life. § 565.008.2, RSMo 1978.[3]

Although the record does not show when the plea negotiations first began—Branyan testified, as reported earlier, that there

---

**3.** Section 565.008, RSMo 1978, was repealed effective October 1, 1984, by the legislation identified in footnote 2, *supra.*

were plea negotiations just a few days before trial and the final offer (the one movant ultimately accepted) was rejected at that time—there is no evidence that movant was offered an opportunity to plead guilty to anything other than two counts of capital murder until trial was imminent. If movant is saying he waited two years to be exonerated at trial, only to be coerced by his lawyers into pleading guilty once trial was under way, that argument is addressed *infra* in our discussion of allegation "(3)."

Allegation "(2)" in movant's point on appeal is that his motion and testimony show his confusion as to the elements of the plea agreement. As the point contains no clue as to what movant was confused about, we have searched the argument portion of his brief for a tip. The only hints we find are a reference to "the profound confusion of [movant] as to the sentence he received," and a statement that movant "does not appear to know whether a life sentence as mentioned in the plea agreement is the same as the natural life sentence to which his guilty plea transcript refers and whether he will ever be eligible for parole."

Movant's testimony in the motion court, on direct examination by his lawyer,[4] contained this colloquy:

"Q. Now, were you sentenced to ... your natural life in the penitentiary?

A. Yes, sir.

Q. And that is on the sentencing documents in the court file, is that correct?

A. That's in the transcript. That's not in the plea agreement that I signed.

Q. Yes. It's also, though, in the sentencing documents signed by the Judge, isn't it?

A. Yes.

Q. It says you're sentenced to the penitentiary for the rest of your natural life or words to that effect?

A. Yes, sir.

Q. And I've informed you that I think there is no such sentence, is that correct?

A. Yes, sir.

Q. And the understanding was you would receive a life sentence, is that right?

A. That's right.

Q. And do you understand them to be different?

A. I believe they're different, yes."

Our first observation is that the lawyer who represented movant in the motion court was incorrect in thinking there was no such sentence as imprisonment for one's natural life. Section 565.008.2, RSMo 1978 (since repealed),[5] the statute under which movant was sentenced, provided:

"Persons convicted of murder in the first degree shall be punished by imprisonment by the division of corrections during their natural lives...."

Our second observation is that while the transcript of the proceedings at which movant entered his pleas of guilty has been furnished us, movant has failed to supply us a copy of the formal judgment entered by the trial court, thus we cannot verify that the sentences assessed were imprisonment for movant's natural life. Assuming, however, that the sentences, as recited in the formal judgment, are imprisonment for movant's natural life, we see no difference between such sentences and sentences to life imprisonment.

■ We are aware, of course, that the statute that governed sentencing on a conviction of capital murder in violation of § 565.001, RSMo 1978 (since repealed), was paragraph 1 of § 565.008, RSMo 1978 (since repealed), and that such paragraph provided that the only authorized punishment was either death or imprisonment during one's natural life without eligibility

---

4. The lawyer who represented movant in the motion court is not the lawyer representing movant in this appeal.

5. Footnote 3, *supra.*

for probation or parole until he had served a minimum of 50 years of his sentence. Nothing in § 565.008.2, RSMo 1978 (since repealed), the statute under which movant was sentenced, provided that a person convicted of first degree murder and sentenced to imprisonment during his natural life would be ineligible for probation or parole until he had served a specified number of years. We therefore find no difference in substance between the provision in the plea agreement that movant would receive a sentence of life imprisonment on each of two counts of first degree murder, to run concurrently, and the sentences presumably recited in the formal judgment, i.e., two concurrent sentences to imprisonment during movant's natural life. It is thus evident that movant could not have been prejudiced by the assumed variance in verbiage between the sentences called for in the plea agreement and the sentences allegedly imposed, and attorneys Deaton and Branyan could not have been ineffective in overlooking such difference or failing to explain to movant that it was inconsequential.

■ Allegation "(3)" in movant's point on appeal is that his attorneys assured him of a death sentence, thereby rendering his pleas of guilty "coerced and involuntary."

The testimony of attorneys Deaton and Branyan as to what they told movant about the possibility of a death sentence appears earlier in this opinion. Nothing in their testimony supports movant's averment that they assured him a death sentence.

The only passage in movant's testimony in the motion court supporting his allegation on appeal that his attorneys assured him of a death sentence was his testimony that he changed his mind and decided to plead guilty "about four hours after they told me I was going to die." The motion court was not obliged to believe that testimony, *State v. Hurtt*, 509 S.W.2d 14, 16[5] (Mo.1974), as the motion court had the right and duty to pass upon the credibility of the witnesses, *State v. Shields*, 441 S.W. 2d 719, 719[2] (Mo.1969).

Movant bore the burden of establishing his grounds for relief by a preponderance of the evidence. Rule 27.26(f); *Fields v. State*, 466 S.W.2d 679, 681[2] (Mo.1971). As movant's testimony was the only evidence supporting his contention that his attorneys assured him a death sentence, it is manifest that the motion court found movant's testimony incredible, as the motion court, as noted earlier, held that movant's allegations in the 27.26 proceeding were unsupported by the evidence and that movant had failed to establish any ground for relief.

Our review is limited to a determination of whether the findings, conclusions and judgment of the motion court are clearly erroneous. Rule 27.26(j); *Futrell v. State*, 667 S.W.2d 404, 405[1] (Mo. banc 1984).

Movant, at the end of the third day of trial, faced a difficult decision. He could proceed with trial on two counts of capital murder with the possibility that a death sentence would be assessed and ultimately carried out, or that he would be sentenced to two consecutive life sentences without eligibility for probation or parole until he had served a minimum of 50 years of each, or he could accept the State's offer of a plea agreement on two counts of first degree murder for which he would receive the less severe (and concurrent) sentences he now seeks to vacate.

■ A plea of guilty entered to avoid the possibility of the death penalty is not thereby rendered involuntary. *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 1472[17], 25 L.Ed.2d 747, 760[18] (1970); *Skaggs v. State*, 476 S.W.2d 524, 528[6] (Mo.1972); *White v. State*, 694 S.W.2d 825, 827[1] (Mo.App.1985).

It was the duty of attorneys Deaton and Branyan to advise movant of the possible consequences of taking the case to trial so that he could intelligently decide whether to do that or to accept the tendered plea agreement. *Taylor v. State*, 539 S.W.2d 589, 590 (Mo.App.1976). The testimony of those attorneys demonstrates that they

carefully counseled movant on the risks inherent in standing trial and that they made certain he understood he had the option of accepting the plea agreement. Their testimony further shows that the decision to accept the plea agreement instead of standing trial on two counts of capital murder was made by movant voluntarily and without compulsion by them. While Branyan's alleged statement "Ronnie, I don't want to see you die" was—if indeed made—more emotional than analytical, nowhere in movant's testimony did he assert that such statement was the pivotal factor in his decision to accept the plea agreement. In fact, the following dialogue between movant and the trial court at the time movant entered his pleas of guilty shows otherwise:

"THE COURT: ... Do you have any complaints or criticisms about your lawyers?

[Movant]: No, sir, very professional.

THE COURT: All right. Are you satisfied with their services?

[Movant]: Yes, Your Honor.

....

THE COURT: ... Mr. Conn, except for this plea agreement that you've entered into, has anybody made any promise to get you to plead guilty?

[Movant]: No, sir.

THE COURT: And has anybody used any force or threat to you in any way to get you to plead guilty to these charges?

[Movant]: No, sir.

THE COURT: Are you pleading guilty to these two counts because you are, in fact, guilty?

[Movant]: Yes, sir.

THE COURT: Now, are you pleading guilty also because of the discussions that your attorney and the Prosecuting Attorney have had that resulted in this plea agreement? Is that one of the reasons that you're pleading guilty?

[Movant]: Yes, sir.

THE COURT: Because of these discussions that resulted in the plea agreement?

[Movant]: Yes."

Movant, who was under oath at the time of the colloquy above, also told the trial court he was 41 years of age, a high school graduate, could read, write and understand the English language, was in good physical health, and had never had any mental problems. The motion court took into account the transcript of the guilty plea proceeding in making its findings that each of movant's pleas of guilty was made freely, voluntarily, and intelligently, and that movant was not denied the effective assistance of counsel but in fact received effective assistance of counsel.

The record before us amply supports the motion court's findings on those issues. Movant's claim of error is therefore denied and the judgment of the motion court is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.