MEDICINE SHOPPE
INTERNATIONAL,
INC., Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. SC 85781.

Supreme Court of Missouri,
En Banc.

Jan. 25, 2005.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Jefferson City, for Appellant.

Richard E. Lenza, William B. Prugh, Kansas City, for Respondent.

MICHAEL A. WOLFF, Judge.

## Introduction

The director of revenue urges the Court to overturn its 21–year–old decision in *Brown Group, Inc. v. Administrative Hearing Commission*, 649 S.W.2d 874 (Mo. banc 1983), interpreting a corporate tax statute. The Court's decision, however, has been followed these past 21 years:

the judicial interpretation has become woven into the fabric of the statute, its interpretation has been incorporated into the director's taxation forms, and the statutory provision has been left untouched by the General Assembly.[1]

An incorrect or otherwise undesirable interpretation of a statute can be changed by the General Assembly. The General Assembly's inaction has sometimes been interpreted to be approval of the Court's reading of a statute.[2] Legislative inaction, however, can just as well mean that the forces arrayed in favor of changing the law are matched by the forces against changing it. In truth, the match does not have to be an even one, for the legislative process in our republican form of government is designed more to prevent the passage of legislation than to encourage it.[3] An incorrect judicial interpretation of a statute may also stand simply because the legislature has paid no attention to it. Thus, it is speculative to infer legislative approval from legislative inaction.[4]

In addition to seeking legislative change of an incorrectly interpreted statute, a party in a subsequent case may ask the court to re-examine and overrule its previous case. The doctrine of *stare decisis*—to adhere to decided cases—promotes stabili-

---

1. The statute at issue, section 143.451, RSMo, has been amended twice since *Brown Group* was issued—in 1988 and 1997. These amendments added four new subsections, but none of these changes were relevant to the provisions interpreted by the Court in *Brown Group*.

2. " '[W]here a court of last resort construes a statute, and that statute is afterwards re-enacted, or continued in force, without any change in its terms, it is presumed that the legislature adopted the construction given to it by the court.' " *Jacoby v. Missouri Valley Drainage Dist. of Holt County*, 163 S.W.2d 930, 939, 349 Mo. 818 (Mo.1942) quoting *Handlin v. Morgan County*, 57 Mo. 114, 116 (1874).

   " 'The fact that the legislature has not seen fit by amendment to express disapproval of a contemporaneous or judicial interpretation of a particular statute, has been referred to as bolstering such construction of the statute, or as persuasive evidence of the adoption of the judicial construction. In this respect, it has been declared that where a judicial construction has been placed upon the language of a statute for a long period of time, so that there has been abundant opportunity for the law-making power to give further expression to its will, the failure to do so amounts to legislative approval and ratification of the construction placed upon the statute by the courts, and that such construction should generally be adhered to, leaving it to the legislature to amend the law should a change be deemed necessary.' " *State ex rel. Howard Elec. Co-*

*op. v. Riney*, 490 S.W.2d 1, 9 (Mo.1973) quoting 50 Am.Jur. *Statutes* s 326, pp. 318–319. *See also Ex parte Carey*, 306 Mo. 287, 267 S.W. 806 (Mo.1924); *Schawacker v. McLaughlin*, 139 Mo. 333, 40 S.W. 935 (Mo.1897); *Easton v. Courtwright*, 84 Mo. 27 (1884); *State ex inf. Gentry v. Meeker*, 317 Mo. 719, 296 S.W. 411 (Mo.1927); *State ex rel. Steed v. Nolte*, 345 Mo. 1103, 138 S.W.2d 1016 (Mo. 1940); *Bailey v. Canadian Shield General Ins. Co.*, 380 S.W.2d 378 (Mo.1964).

3. The state constitution's method for enacting legislation is modeled upon the federal government. Of federal legislation, it is said:

   The Framers believed that the Constitution's requirements of bicameral approval and presentment to the President (with the possibility of a veto) would assure that most social and economic problems would not generate legislation at all, because the two bodies would have different views about what should be done. *Federalist Papers # 73*.

   William Eskridge, Jr. et al., *Cases and Material on Legislation: Statutes and the Creation of Public Policy* 67 (3d ed.2001).

4. " '[L]egislative inaction has been called a "weak reed upon which to lean" and a "poor beacon" to follow in construing a statute.' " *Goldberg v. State Tax Com'n*, 639 S.W.2d 796, 813 (Mo.1982) (Higgins, J., dissenting) quoting 3 Sutherland Statutory Construction, s 49.10, p. 291.

ty in the law by encouraging courts to adhere to precedents. But, the adherence to precedent is not absolute, and the passage of time and the experience of enforcing a purportedly incorrect precedent may demonstrate a compelling case for changing course. American history is replete with examples of instances where experience and the changing needs of society trump adherence to precedent and demonstrate the fallacy of an earlier interpretation.[5]

These considerations come into play in this case, where the director of revenue seeks a judicial overruling of this Court's previous interpretation of the taxation statute at issue in this case—the single-factor apportionment provisions of section 143.451.2.[6]

The statute allows a corporation that has business income from Missouri and from other states to apportion its total business revenue by a formula so as to determine the income that Missouri will tax. Missouri law offers the apportionment statute as an alternative to keeping track, dollar by dollar, of income that has a requisite connection to Missouri so that it can, consistent with the United States constitution, be subjected to Missouri's income tax. *See generally Dow Chemical Co. v. Director of Revenue*, 834 S.W.2d 742 (Mo. banc 1992); *Maxland Development Corp. v. Director of Revenue*, 960 S.W.2d 503 (Mo. banc 1998).

■ The question is whether the corporation can exclude so-called "passive" investment income—earned on non-operating excess funds invested by the corporation's parent company in another state—before applying the formula for

---

**5.** Judicial re-interpretation is particularly apt with respect to constitutional principles, because the amendment process—even in states like Missouri that more readily amend their constitutions than does the United States—is cumbersome and an amendment simply to overrule an incorrect precedent is much more difficult than a legislative change to correct an unwarranted interpretation of a statute.

**6.** All statutory references are to RSMo 2000 unless otherwise indicated. The statute provides:

143.451. Division of interstate income
1. Missouri taxable income of a corporation shall include all income derived from sources within this state.
2. A corporation described in subdivision (1) of subsection 1 of section 143.441 shall include in its Missouri taxable income all income from sources within this state, including that from the transaction of business in this state and that from the transaction of business partly done in this state and partly done in another state or states. However:
(1) Where income results from a transaction partially in this state and partially in another state or states, and income and deductions of the portion in the state cannot be segregated, then such portions of income and deductions shall be allocated in this state and the other state or states as will distribute to this state a portion based upon the portion of the transaction in this state and the portion in such other state or states.
(2) The taxpayer may elect to compute the portion of income from all sources in this state in the following manner:
. . . .
(b) The amount of sales which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state, and the amount thus obtained shall be divided by the total sales or in cases where sales do not express the volume of business, the amount of business transacted wholly in this state shall be added to one-half of the amount of business transacted partly in this state and partly outside this state and the amount thus obtained shall be divided by the total amount of business transacted, and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of Missouri taxable income. The investment or reinvestment of its own funds, or sale of any such investment or reinvestment, shall not be considered as sales or other business transacted for the determination of said fraction.
. . . .

determining what portion of its income Missouri may tax.

Expressing the statutory language as a formula, the revenue of a corporation that is subject to Missouri tax equals:

$$NI \times \frac{Sw + \frac{1}{2}Sp}{St}$$

Where NI is net income; Sw is the amount of sales or business wholly within Missouri; Sp is the amount of sales or business partly within and partly outside Missouri; and St is total sales or business from all sources.

The specific question is whether the non-Missouri investment income—earned on money swept from the Medicine Shoppe accounts on a daily basis through an agreement with Medicine Shoppe's corporate parent—should be included in the formula as part of Medicine Shoppe's "net income." This investment income—made under an investment agreement between the Ohio parent and Missouri subsidiary—totals millions of dollars for the tax years in question.

### The Investment Agreement

Medicine Shoppe is a Delaware corporation with its headquarters in St. Louis. All of Medicine Shoppe's offices and officers, and all but a couple of its employees, are located in Missouri. Medicine Shoppe is a franchisor of retail pharmacies throughout the United States and provides a system, and services that support that system, for the franchisees to run their retail pharmacy operations. Medicine Shoppe, in 1995, became a wholly owned subsidiary of Cardinal Health, an Ohio corporation with its headquarters in Dublin, Ohio.

After becoming a Cardinal Health subsidiary, Medicine Shoppe entered into an investment agreement with its corporate parent in 1997. Under the agreement, any funds in Medicine Shoppe's bank accounts at the end of each day in excess of those needed for operating expenses are transferred to a Cardinal Health "corporate concentration account." [7] Cardinal Health invests the funds in this account for Medicine Shoppe's benefit. The investable funds remain the assets of Medicine Shoppe, but Cardinal Health has control over the funds in the account and the investment decisions. Cardinal Health pays Medicine Shoppe interest on the invested funds at a rate of return of 7.72% per annum that is credited to the investable funds account on a monthly basis.

### Medicine Shoppe's Missouri Income Tax Returns

The income tax periods at issue are July 1, 1998, through June 30, 1999 ("1998"), July 1, 1999, through June 30, 2000 ("1999") and July 1, 2000, through June 30, 2001 ("2000"). For 1998, 1999 and 2000, Medicine Shoppe's income was included in consolidated federal income tax returns that Cardinal Health filed. Medicine Shoppe filed separate Missouri returns and separate returns in other states.

Missouri law, as noted, allows a corporation doing business within and without Missouri alternative methods to allocate and apportion its income for Missouri income taxation. On its 1998, 1999 and 2000 Missouri income tax returns, Medicine Shoppe calculated its taxable income by using the single-factor apportionment method of section 143.451.2(2)(b). Medicine Shoppe classified and reported the interest on its investments through its agreement with Cardinal Health as non-Missouri source income that was not subject to Missouri's taxation and, hence, was not included in the apportionment formula.

7. In the event of a shortfall on any particular day, Cardinal health is to transfer an amount of investable funds necessary to restore a zero balance to Medicine Shoppe's operating account. However, the record does not reflect that this has ever been done.

The director of revenue disallowed the classification of the interest as non-Missouri source income and issued notices of deficiency for 1998, 1999 and 2000. Medicine Shoppe timely protested the notices of deficiencies and timely appealed the director's final decisions to the Administrative Hearing Commission. This Court has jurisdiction. Mo. Const. art. V, sections 3 and 18.

**Non–Missouri Source Investment Income**

■ The language of section 143.451 is clear that only income from sources entirely within or partially within Missouri is subject to Missouri corporate income taxation. "The source of income has been defined as the place where the income was produced." *Bass Pro Shops, Inc. v. Director of Revenue*, 746 S.W.2d 97, 98 (Mo. banc 1988). Under the source of income concept, income produced or sourced outside Missouri is excludable from income subject to Missouri taxation.

Two early cases involving Union Electric's non-Missouri source income give background to this Court's decision in *Brown Group* in 1983, though neither case involved the single-factor apportionment statute. In *Union Electric Co. v. Coale*, 347 Mo. 175, 146 S.W.2d 631, 635 (1940) (*Union Electric I*), this Court held that dividends from stock in foreign corporations that had no capital or business operation in Missouri were not subject to Missouri income tax for 1936 because they were not Missouri source income. The Court held that the source of income is the place where it was produced and that the income in question was not produced in this state. *Id.*

*Brown Group, Inc. v. Administrative Hearing Commission*, 649 S.W.2d 874, applied the *Union Electric* cases to the single-factor apportionment formula and directly addressed the question of whether certain non-Missouri source income should be excluded from the net income amount in the formula. At issue in that case was Brown Group's royalty income, paid by a Japanese corporation for the use of trade names, shoe designs and shoe patterns developed by a wholly-owned subsidiary of Brown Group. This Court directly addressed the director's argument—which is the same as the argument in this case—that "when a taxpayer elects under sec. 143.451.2(2) to apportion income using the single factor formula it is precluded from allocating any of its income prior to apportionment and that the legislature intended to levy and apportion tax upon the entire net income." *Id.* at 879.

*Brown Group* relied on *A.P. Green Fire Brick Co. v. Missouri State Tax Commission*, 277 S.W.2d 544 (Mo.1955), to determine what is non-Missouri source income—the "source of income" is the place in which the trademarks, trade names and manufacturing processes are used and the income produced. *Id.* at 547. That means, the Court said, that the source of Brown Group's income from royalties from a Japanese company were wholly outside Missouri, as the trade names and manufacturing processes were used and the income was produced in Japan and other foreign countries. "Since the royalties were a source of income wholly without Missouri," this Court held, "they do not figure in the taxing formula."[8] The kind of income ex-

---

8. This Court continued:
"We hold fast to the basic precept that tax statutes are to be strictly construed in favor of the taxpayer and against the taxing authority. *Staley v. Missouri Director of Revenue*, 623

S.W.2d 246, 250 (Mo. banc 1981). The Director's argument that upon election by the taxpayer to use the single factor formula, all income from any source must be included in

cluded from the formula—and, hence, from Missouri taxation—is so-called "passive" investment income from outside Missouri.

**Passive Investment Income**

This Court acknowledged in *Medicine Shoppe International v. Director of Revenue*, 75 S.W.3d 731 (Mo. banc 2002) (*Medicine Shoppe I* ), that "[t]he *Union Electric* cases retain vitality to the extent that they recognize that wholly passive investments outside the state of Missouri are not included in the taxation formula used to determine Missouri taxable income." *Id.* at 735.

The issue in *Medicine Shoppe I* was whether Medicine Shoppe's income from loan origination fees and interest income on money loaned to non-Missouri franchisees was non-Missouri source income and, thus, not subject to apportionment. *Medicine Shoppe I* held that the "brains" of the operation were in Missouri but other portions of the income producing effort were performed in some other state; the sales or amount of business transacted were partly within and partly without Missouri for purposes of the apportionment fraction. *Id.* at 734 citing *Bank Building and Equipment Corporation of America v. Director of Revenue*, 687 S.W.2d 168, 171 (Mo. banc 1985).

■ The facts in this case are different from *Medicine Shoppe I,* in part, because Medicine Shoppe became a subsidiary of Cardinal Health in 1995. The question in this case is whether the interest income at issue is like that in the *Union Electric* cases—wholly "passive" non-Missouri income—and not included in the calculation of Missouri income tax, or is like that in *Medicine Shoppe I*—generated by efforts

within Missouri sufficiently active to be considered an "efficient cause" that contributes directly to the production of income, even though not entirely in Missouri.

The record does not show how and where Cardinal Health invested the funds it received from Medicine Shoppe pursuant to the investment agreement. It is undisputed, however, that the funds from Missouri were controlled by the Ohio-based parent corporation and the only decision over which Medicine Shoppe has any control is whether to terminate the investment agreement.

Appropriately applying these principles, the Administrative Hearing Commission determined that the investment income from Cardinal Health is not income from sales or business transacted for Missouri income tax purposes. Therefore, the commission concluded the income from Cardinal Health is not income from sales or business transacted for purposes of calculating the single-factor apportionment fraction. Based on this conclusion, the commission calculated Medicine Shoppe's tax liability for the three years at issue.

The commission's decision was authorized by law and supported by competent and substantial evidence upon the entire record. Under this Court's standard of review,[9] the commission's decision is upheld.

**Conclusion**

The state of Missouri and its corporate taxpayers have had 21 years of applying the *Brown Group* holding to the single-factor apportionment taxation statute. This decision has been undisturbed by sub-

---

the base income is out of phase with that principle." 649 S.W.2d at 880–81.

**9.** *See Buchholz Mortuaries, Inc. v. Director of Revenue,* 113 S.W.3d 192, 193 (Mo. banc

2003); *Concord Publishing House v. Director of Revenue,* 916 S.W.2d 186, 189 (Mo. banc 1996).

sequent legislation. The decision is reflected in the director's corporate income tax forms that allow the taxpayer to remove certain "non-Missouri source income," such as interest, dividends, royalties and rental income, from its income prior to the application of the apportionment fraction. The director notes that nothing in the statute suggests a category of income that is excluded from net income (i.e. non-Missouri source income) before the net income is multiplied by the apportionment factor. That may be true, but *Brown Group*—reflected in the director's forms that are used and relied upon by taxpayers—is the current interpretation. In these circumstances, the Court's interpretation is presumed to be correct, and, in effect, has become part of this statute. If the interpretation is incorrect—and it does result in the loss of millions of dollars in revenue—the General Assembly is the proper place for amendment to the statute.

The decision of the Administrative Hearing Commission with regard to the calculation of Medicine Shoppe's lawful tax liability for the tax years 1998, 1999 and 2000 is affirmed.

All concur.