

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF: S.R.R., D.J.R., AND T.L.R.; | ) ) ) | WD78651 and WD79074 |
| Plaintiffs | ) ) | OPINION FILED: |
| JUVENILE OFFICER, | ) ) | May 17, 2016 |
| Respondent, | ) | |
| v. | ) ) | |
| T.R. (FATHER), | ) ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri
Honorable John M. Torrence, Judge**

**Before Division Two:
Victor C. Howard, P.J., Thomas H. Newton, and Karen King Mitchell, JJ.**

T.R., Father, appeals the April 21 and September 23, 2015, juvenile court judgments confirming the Commissioner's findings and recommendations that adopted permanency plans as to his children, S.R.R., D.J.R., and T.L.R. The juvenile officer has filed motions to dismiss in both appeals, which were consolidated before this Court. We took the motions with the appeals. We grant the motions and dismiss the consolidated appeal.

Father pleaded guilty to second-degree statutory rape in August 2011 and was serving his sentence in July 2013 when the Jackson County Juvenile Officer filed

petitions in family court alleging that S.R.R. (a daughter born on March 22, 2006), D.J.R. (a son born on February 4, 2003), and T.L.R. (a son born on August 4, 2011) were without proper care, custody, and support. Mother had allegedly neglected the children and allowed them to have contact with her fiancé, a registered sex offender who had at one time pleaded guilty to first-degree endangering the welfare of a child. In September 2013, the juvenile court issued an order following an adjudication hearing, sustaining the allegations as to Mother and ordering individual counseling for Mother and the two older children. The court appointed counsel for Father, who has been represented by counsel since then. In October 2013, the juvenile court issued a judgment sustaining the allegations as to Father and ordering that contact with him "shall be as therapeutically recommended." The children were placed in Mother's custody subject to a number of conditions. In September 2014, the juvenile court issued an order following a case review, committing the children to the state's custody for placement.[1] Mother was allowed supervised visits with certain conditions, and "[c]ontact with the father shall be as therapeutically recommended." The stated goals were "permanency and reunification."

The recommended disposition and goals did not change until the juvenile court entered the April 21, 2015, order and judgment, terminating the prior disposition. This order followed a case review and hearing during which the court found that Mother failed to participate regularly in therapy and had unstable housing, while Father "remains incarcerated." The new goal was "termination of parental rights and adoption" because "reunification in the next 90-120 days is not feasible" and "[t]he

---

[1] The children had been placed in March 2014 with the couple who later expressed an interest in adopting them.

2

children have been under jurisdiction 21 months." The court allowed Mother supervised visits and again stated that Father's contact "shall be as therapeutically recommended." During the hearing on which this order was based, the children's therapist testified that she had received two letters from Father to the children, but did not share them, because the letters contained, for the most part, quotations from scripture, rather than questions about the children's lives or information about what Father was doing. According to the therapist, the children were angry about Mother's recent loss of housing, and the letters could have stirred up additional emotional problems. The therapist also testified that "when I've talked with the children about their dad, they just kind of give me this blank look. They don't say anything. They don't have much of a reaction to their – about talking about their father. So I didn't want to stir anything up at the time."[2] The family's caseworker testified that Father's expected release date was February 2016. The court's order indicated that the next case-review hearing would be held in September 2015.

Father appealed the April 21, 2015, order and judgment to this Court. The juvenile officer filed a motion to dismiss, asserting that the April 20, 2015, hearing was a permanancy-planning review under section 210.720 and that the order was not appealable.[3] In his opposition, Father argued that the court's judgment was final or that he had brought the appeal "in a good faith attempt to change the law." He asked

---

[2] The therapist also testified that, on further review, she had found parts of the letters that she could share and that she intended to do so that weekend during a family session. She noted as well that she was working with the family's caseworker to provide direction for Father on better communicating with his children in the future.

[3] Statutory references are to RSMo 2000 and cumulative supplements, unless otherwise indicated.

3

this Court to re-examine *In re L.E.C.*, 94 S.W.3d 420 (Mo. App. W.D. 2003), and to "permit the appeal of this *final* permanancy plan judgment."

Thereafter, the juvenile court conducted another case-review hearing and entered an order and judgment on September 23, 2015. According to this order, "[t]he permanency plan is adoption." The court also stated, "Children's Division shall conduct an adoption staffing within 30 days from the date of this order." The court found, among other matters, that Mother had not been participating in individual therapy, "and this has been a factor in preventing reunification." The court also found, "Given mother's history, her participation in therapy is essential so that she is able to demonstrate an ability and understanding of the importance of protecting her children from men who may represent a threat to them. The mother has no suitable residence for the children at this time." Supervised visits for the mother were allowed, and another permanency hearing was scheduled for January 2016. Father is not mentioned in this court order, but his counsel was present during the September 15, 2015, hearing on which the order was based. Counsel reminded the juvenile court in closing that Father was set to be released in February 2016 and that he was not the focus of the hearing.

Father filed an appeal to this Court from the September 23, 2015, order and judgment. Again, the juvenile officer filed a motion to dismiss, arguing that the order appealed from was not final and arose from a case-review hearing conducted under section 210.720. The juvenile officer also noted that, while the permanency goal had been changed to adoption in April 2015, it could be changed back to reunification. In this regard, the juvenile officer stated that Father has the opportunity, once released

4

from incarceration, to "find stable housing, re-establish a relationship with his children and make substantial progress in the time before a termination action is filed." In his opposition, Father relied on the same arguments raised in his opposition to the motion filed after he appealed the April 21, 2015, order and judgment.

## Legal Analysis

Although we do not reach the merits of the consolidated appeal, we recite Father's points on appeal to further support our resolution of the juvenile officer's motions to dismiss. Those points are whether the juvenile court erred because the evidence was insufficient to support a finding that (1) abandonment grounds existed for termination under Missouri law, and (2) termination of Father's rights was in the children's best interest.[4] In arguing both of his appeals, Father asks that we apply standards and case law used in reviewing a judgment that terminates parental rights, which standards, under Chapter 211 of the Missouri Revised Statutes, are particularly inappropriate for reviewing permanency-plan findings made following a section 210.720 hearing. If the juvenile court had terminated Father's parental rights, we would be constrained to agree that the evidence was insufficient to support that determination. The juvenile court, however, conducted permanency hearings, and the evidence introduced pertained to the questions before the court in establishing a permanency plan, which is the goal of a permanency hearing. As such, factors

---

[4] In his second brief addressing points specific to his second appeal, Father similarly argues that the evidence during the September 2015 permanency hearing was insufficient for the trial court to find that he had abandoned the children or that termination was in their best interests. In fact, while Father's counsel was present during this case-review hearing, no evidence was introduced of anything other than Mother's living arrangements and participation or lack thereof in the counseling, visitation, and therapy the Children's Division offered.

5

different from those in termination proceedings are at issue.[5] The evidence would likely never be sufficient during a permanency hearing to justify termination of parental rights, which occurs, if at all, following hearings conducted under sections 211.447-211.490.

In *In re L.E.C.*, this Court addressed the same issue on appeal underlying Father's appeal here: "that the trial court erred in changing the permanency plan from reunification to adoption." *In re L.E.C.*, 94 S.W.3d at 424. We explained at some length that lacking a common-law right of appeal or a statutory right to appeal a section 210.720 order, a litigant cannot rely on section 512.020, the general statute relating to civil appeals, because a change in a permanency plan "is not in itself a final adjudication." *Id*. at 425. Rather, we stated, "It is, as the name implies, a 'plan,' not a result, although certain changes are implemented in connection with the

---

[5] The Legislature has required that the court consider during a permanency hearing "all relevant factors, including":

    (1) The interaction and interrelationship of the child with the child's foster parents, parents, siblings, and any other person who may significantly affect the child's best interests;
    (2) The child's adjustment to his or her foster home, school and community;
    (3) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved . . .; and
    (4) The needs of the child for a continuing relationship with the child's parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child.

§ 210.720.2.

    The purpose of a permanency hearing is stated as follows:

    [To determine] in accordance with the best interests of the child *a permanent plan for the placement of the child*, including whether or not the child should be continued in foster care or whether the child should be returned to a parent, guardian or relative, or whether or not proceedings should be instituted by either the juvenile officer or the division to terminate parental rights and legally free such child for adoption.

§ 210.720.1 (emphasis added). In contrast, the court's focus during a termination hearing is primarily on the parent's conduct vis-à-vis the child and his or her fitness to parent. § 211.447.

6

plan. The jurisdiction of the Circuit Court continues, however, and is one of ongoing management."[6] *Id.* We further explained that allowing review of a section 210.720 order "would cause inefficiency and lengthen the time needed to address the ultimate issue of parental rights termination." *Id.* We concluded that the permanency-plan order is non-appealable. *Id*. at 426. More recently, the Eastern District relied on *In re L.E.C.* in dismissing a father's appeal from a permanency-plan order entered in Washington County. *In re T.G.O.*, 360 S.W.3d 355, 358 (Mo. App. E.D. 2012).[7]

Father eloquently argues in his opposition to the juvenile officer's motion to dismiss that "[a] Permanency Plan Order is a final judgment due to the nature of juvenile proceedings, and often operates as the detonating trigger for termination of parental rights." He also cites *Medicine Shoppe International, Inc. v. Director of Revenue*, 156 S.W.3d 333, 334-35 (Mo. banc 2005), as authority for the proposition that a party may seek re-examination and overruling of the court's prior interpretation of a statute. While the Missouri Supreme Court acknowledged that "adherence to precedent is not absolute, and the passage of time and the experience of enforcing a purportedly incorrect precedent may demonstrate a compelling case for changing course," it upheld its prior interpretation of a taxation statute, noting that it had been applied by the state and corporate taxpayers for twenty-one years and was "undisturbed by subsequent legislation." *Id.* at 335, 338-39.

---

[6] This observation is borne out here, as Father first appealed from an order he characterized as "final," and yet the court conducted another case review after issuing it.

[7] The Southern District cited *In re L.E.C.* as authority this year when it dismissed a grandfather's appeal from a denial of his motion for relative placement of a juvenile under section 210.565.1. *In re A.N.L. v. Maries Cnty. Juvenile Office*, No. SD33670, 2016 WL 530737, at *2, *4 (Mo. App. S.D. Feb. 10, 2016) (stating, "The right to appeal is purely statutory. An appeal lacking a statutory basis confers no authority upon an appellate court except to dismiss the appeal.").

7

Father appeals broadly to the protection afforded parental rights under the Constitution and claims that due process guarantees the right to be heard "at a meaningful time." He contends that permanency hearings determine the direction of future proceedings and "can increase the risk that the natural family will be destroyed." Father further argues that "denying a parents' [sic] right to appeal a permanency plan judgment directly contradicts the Missouri standard regarding the paramount concern of the best interests of the child." As to this concern, he claims that delaying review of a permanency plan "increases the risk that children form deep and lasting bonds with temporary caregivers, only to be ripped from this comforting grip and returned to their natural, yet foreign, homes upon appellate decision." Given these consequences, he urges this Court to find that appeal from a permanency-plan order is permitted under section 512.020 as a final judgment and states that "no legal rationale exists to require deferral of . . . appellate review until termination of parental rights proceedings are formally initiated."[8]

We disagree. Sound precedential authority provides that legal rationale, has done so for thirteen years, was confirmed as recently as February of this year, and has remained undisturbed by legislative action in the interim. Father's policy arguments are better directed toward the General Assembly, which can decide, based on empirical evidence, whether parental rights and a child's best interests are so jeopardized by a permanency-plan order that immediate appeal is required to protect

---

[8] Father also asserts that the Family Court Commissioner's findings and recommendations were "subsequently adopted and ordered by the District Judge pursuant to R.S.Mo., *Chapter 211*, Section 029." We would note that section 211.029, to the extent that it may apply to proceedings under Chapter 210, merely provides the right to challenge a commissioner's findings and recommendations by filing a motion for a juvenile-court hearing.

those rights and interests. As indicated above, Father challenges the order as if it were a termination of parental rights. But termination standards are simply inapt as guidance for a reviewing court that has been asked to consider the sufficiency of evidence introduced during a permanency hearing. Until the Legislature changes the goal of a permanency hearing or the factors the juvenile court is to consider in establishing a permanency plan that focuses on adoption rather than reunification, Chapter 211 termination criteria cannot provide the foundation for appellate review. Father has not made a "compelling case for changing course."

Father relies on his particular circumstances to argue that the juvenile court never heard evidence as to his fitness to parent the children and that the only barrier to him acting as a parent is his incarceration, which was due to end in February 2016. He claims as well that incarceration does not constitute abandonment which is defined as "a voluntary and intentional relinquishment of the custody of the child to another." According to Father, his letters, efforts to seek representational counsel, and pursuit of these appeals all demonstrate his intent to continue the parent-child relationship.[9]

Because such arguments go to the merits of Father's appeal, we decline to address them other than to observe that the permanency plans here demonstrate that the juvenile court, despite changing the goal from reunification to adoption, continued to allow for the children's interaction with the natural parents and left the

---

[9] Father cites *In re Z.L.R.*, 306 S.W.3d 632, 635-36 (Mo. App. S.D. 2010), and *In re J.M.S.*, 83 S.W.3d 76, 83-84 (Mo. App. W.D. 2002), to support his claim that his efforts were sufficient to show his intent to continue the parent-child relationship. The fathers in the cited cases did far more to meet their statutory obligations to provide their children with a continuing relationship, including frequent cards and letters, phone calls, and some financial support given either by the fathers or their relatives in the form of cash, clothing, toys, or gifts.

door open for Father to demonstrate his continuing interest in his children after his release from incarceration and before a termination petition is filed. We would further note that the children had been placed with a couple in March 2014, when Father had already been in prison for nearly three years.[10] The only evidence showing that he attempted to remain in contact with the children consisted of two letters that a therapist had concerns about sharing. He claims that he remained in touch with the Children's Division and therapist. If that is the case, he should have known that Mother was unable to properly house the children and lived with men with whom she was so unfamiliar that she did not even know their last names. Father appears to have been content for nearly two of the five years he was imprisoned to let the state and temporary caregivers take care of his children.

### Conclusion

On the basis of well-reasoned precedent that we decline to overturn, we conclude that the orders from which Father appeals, rendered under section 210.720, are not appealable. Accordingly, we dismiss the consolidated appeal.

/s/ THOMAS H. NEWTON
Thomas H. Newton, Judge

Howard, P.J., and Mitchell, J. concur.

---

[10] Father's incarceration coincides with his younger son's first five years of life. He is essentially a complete stranger to this child. Still, Father has the opportunity to establish a relationship with all of his children on his release from incarceration. Because a termination petition looks to parental conduct occurring six months preceding its filing, he has not lost his opportunity to demonstrate his intent to continue the parent-child relationship. § 211.447.5.

10