**STATE of Missouri, Respondent,**

v.

**Carman L. DECK, Appellant.**

No. SC 89830.

Supreme Court of Missouri,
En Banc.

Jan. 26, 2010.

Rehearing Denied March 2, 2010.

---

Rosemary E. Percival, Office of the Public Defender, Kansas City, for appellant.

Chris Koster, Atty. General, Evan J. Buchheim, Kevin Zoellner, Office of Missouri Atty. General, Jefferson City, for respondent.

ZEL M. FISCHER, Judge.

## I. Introduction and Procedural History

In February 1998, a jury found Carman Deck guilty of two counts of first-degree murder, two counts of armed criminal action, one count of first-degree robbery and one count of first-degree burglary for the 1996 robbery and shooting deaths of James and Zelma Long. He was sentenced to two death sentences. This Court affirmed those convictions and sentences *in State v. Deck*, 994 S.W.2d 527 (Mo. banc 1999) ("*Deck I*").[1] Deck filed a motion for

---

1. A full recitation of the facts regarding Deck's conviction is available at *Deck I*.

post-conviction relief pursuant to Rule 29.15, which was overruled by the circuit court. On appeal, this Court reversed the death sentences but affirmed the findings of guilt for his convictions. *Deck v. State,* 68 S.W.3d 418 (Mo. banc 2002) (*"Deck II "*). At the penalty-phase retrial, he was, again, sentenced to two death sentences. This Court affirmed the death sentences in *State v. Deck,* 136 S.W.3d 481 (Mo. banc 2004) (*"Deck III "*), but the United States Supreme Court granted certiorari and found he was denied a fair trial because he appeared in shackles in the presence of the jury. *See Deck v. Missouri,* 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). This Court ordered a second penalty-phase retrial, and Deck again received two death sentences. He appeals these two death sentences on numerous grounds. This Court has exclusive jurisdiction pursuant to Mo. Const. art. V, § 3. The judgment is affirmed.

## II. Point One: Automatic Life Sentence under Section 565.040.2

■ Deck argues the trial court violated his rights to due process, equal protection, and freedom from cruel and unusual punishment under the United States and Missouri Constitutions in sentencing him to two death sentences. He contends section 565.040.2, RSMo 2000, mandates he should have been sentenced to life imprisonment without eligibility for parole because the death sentences imposed were held to be unconstitutional in *Deck,* 544 U.S. at 622, 125 S.Ct. 2007.

### Standard of Review

■ Deck's claim involves the construction and application of section 565.040.2. The construction of a statute is a question of law reviewed *de novo. State v. Perry,* 275 S.W.3d 237, 241 (Mo. banc 2009).

### Analysis

This Court has previously indicated that trial error premised on a constitutional violation not directly affecting the imposition of the death penalty statutory scheme does not result in the application of section 565.040.2. *See State v. Whitfield,* 107 S.W.3d 253 (Mo. banc 2003).

Section 565.040.2 provides that when a death sentence is held to be unconstitutional, the trial court that previously imposed the sentence shall resentence the defendant to life imprisonment without the possibility of parole:

> In the event that any death sentence imposed pursuant to this chapter is held to be unconstitutional, the trial court which previously sentenced the defendant to death shall cause the defendant to be brought before the court and shall sentence the defendant to life imprisonment without eligibility for probation, parole, or release except by act of the governor, with the exception that when a specific aggravating circumstance found in a case is held to be inapplicable, unconstitutional or invalid for another reason, the supreme court of Missouri is further authorized to remand the case for retrial of the punishment pursuant to subsection 5 of section 565.035.

In *Whitfield,* the jury found the defendant guilty of first-degree murder, "but could not agree on punishment during the penalty phase, voting 11 to 1 in favor of life imprisonment." 107 S.W.3d at 256. Because the jury was unable to reach a verdict, the trial judge "undertook the four-step process required by section 565.030.4," which, at the time, was the process to determine punishment. *Id.* The trial judge found the presence of statutory and non-statutory aggravating circumstances, determined these circumstances warranted death, considered whether there were mitigating circumstances and

found they did not outweigh the circumstances in aggravation, and decided under all the circumstances to impose a death sentence. *Id.*

After all of Whitfield's appeals and claims of ineffective assistance were exhausted, the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and held that capital defendants had a right under the Sixth Amendment to a jury determination of any fact that increases their maximum punishment, which included the finding of any statutory aggravating circumstances. *Whitfield*, 107 S.W.3d at 256. Because the judge, not the jury, made the factual findings and sentenced Whitfield to death, this Court held that the sentence of death was unconstitutionally imposed. *Id.*

This Court then applied section 565.040.2 and sentenced Whitfield to life imprisonment without parole. *Id.* This Court held that section 565.040.2 applied because the entry of the death sentence itself was accomplished through the application of an unconstitutional procedure under chapter 565 because the trial court made findings that the Sixth Amendment required a jury to make. *Id.* at 270. In reaching this holding, this Court noted that the alleged error—allowing the judge to determine the facts making Whitfield eligible for the death penalty—was not "some unrelated trial error, but the very entry of a judgment of death based on the judge's findings" in violation of *Ring*, which made the death sentence itself unconstitutional. *Id.* at 270 n. 20.

In applying section 565.040.2, this Court stressed that the situation in *Whitfield*, in which the entry of the death sentence itself was unconstitutional or imposed under an unconstitutional statutory scheme, was distinguishable from a case such as the case at bar in which a new trial is ordered

because of unrelated trial court error that violates a defendant's constitutional rights:

> This [case] is to be distinguished from situations like *State v. Mayes*, 63 S.W.3d 615, 635 (Mo. banc 2001), and other cases cited by the separate opinion, in which a new trial was ordered because of unrelated trial error of constitutional dimension. Here, as discussed, it is the very entry of the death sentence that is held to be unconstitutional, since made without the very jury findings required for imposition of the death penalty under Missouri law, and hence the only remedy is to order imposition of the proper penalty—a life sentence.

*Id.* at 272 n. 23.

This construction of section 565.040.2 was amplified by the dissent in *Whitfield*:

> Section 565.040, however, does not apply to situations of mere procedural error, even if such error is rooted in constitutional principles. First, the plain words of the statute limit its application to events in which "the death penalty [in its totality] . . . is held to be unconstitutional" or in which "any death sentence imposed [as to a particular offender] . . . is held to be unconstitutional". Second, there is no policy reason to mandate a particular more extreme remedy when a lesser, more moderate remedy, is sufficient to guard the procedural rights of the offender.

*Id.* at 274 (Price, J. dissenting) (alteration in original).

This observation is consistent with the legislative intent behind the passage of section 565.040.2. The dissent even went on to point out the several cases in which this Court had concluded that although a death sentence had been imposed, a remand for a retrial of the penalty phase proceeding was the appropriate remedy for a trial error premised on a constitutional violation. *Id.*

The limitation put on the application of section 565.040.2, as articulated in both the majority and dissenting opinions in *Whitfield*, is in perfect harmony with the legislative intent and history behind its enactment.

In this case, Deck is not entitled to the relief allowed by section 565.040.2 because the reversible error recognized by the United States Supreme Court—Deck's shackling in front of the jury—was trial error unrelated to the statutory scheme that set out the death penalty procedures.

### III. Point Two: Veniremembers Removal for Cause

Deck asserts the trial court violated his right to a trial by a fair and impartial jury and abused its discretion in sustaining the State's motions, over his objections, to strike certain potential jurors for cause based on their reluctance to serve as the jury's foreperson. He contends these potential jurors were otherwise qualified to serve as jurors and their only "fault" was a reluctance to serve as foreperson and sign the verdict form of death.

### Standard of Review

"The trial court's 'ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion.'" *State v. Taylor*, 134 S.W.3d 21, 29 (Mo. banc 2004) (quoting *State v. Smith*, 32 S.W.3d 532, 544 (Mo. banc 2000)).

The qualifications for a prospective juror are not determined from a single response, but rather from the entire examination. *State v. Johnson*, 22 S.W.3d 183, 188 (Mo. banc 2000). The trial court can better evaluate a veniremember's commitment to follow the law and has broad discretion to determine the qualifications of prospective jurors. *Id.* "[T]he trial judge evaluates the venire's responses and determines whether their views would prevent or substantially impair their performance as jurors (including the ability to follow instructions on the burden of proof)." *Id.*

Accordingly, a great deal of deference is owed to the trial court's determination that a prospective juror is substantially impaired. *Uttecht v. Brown*, 551 U.S. 1, 7, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). This deferential standard applies whether the trial court has engaged in a specific analysis regarding the substantial impairment; "even the granting of a motion to excuse for cause constitutes an implicit finding of bias." *Id.* "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Id.* at 9, 127 S.Ct. 2218. The trial court's "finding may be upheld even in the absence of clear statements from the juror that he or she is impaired." *Id.* at 7, 127 S.Ct. 2218. "Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.'" *Id.* (alteration in original) (quoting *Wainwright v. Witt*, 469 U.S. 412, 434, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)); *see also State v. Tisius*, 92 S.W.3d 751, 763 (Mo. banc 2002) (quoting *State v. Roberts*, 948 S.W.2d 577, 597 (Mo. banc 1997)) ("Where there is conflicting testimony regarding a prospective juror's ability to consider the death penalty, the trial court does not abuse its discretion by giving more weight to one response than to another and in finding that the venireperson could not properly consider the death penalty"). Even a juror's assurance that he or she can follow the law and consider the death penalty may not over-

come the reasonable inferences from other responses that he or she may be unable or unwilling to follow the law. *Uttecht,* 551 U.S. at 18, 127 S.Ct. 2218.

### 1. The Record Regarding Veniremember Coleman

Although Veniremember Coleman said she could consider a sentence of death, she repeatedly responded with, "I don't know," when asked if she could sign a verdict of death, even knowing that she was not signing simply for herself, but on behalf of the jury as a whole. Ultimately, she said she could make no promises that she could sign a death verdict:

> [Prosecuting Attorney]: ... Ms. Coleman, if you're that juror in that situation, could you give meaningful, realistic, honest consideration to a sentence of death?
>
> [Veniremember Coleman]: Yes.
>
> [Prosecuting Attorney]: Could you give that same sort of consideration to life imprisonment without the possibility of probation or parole?
>
> [Veniremember Coleman]: Yes.
>
> [Prosecuting Attorney]: Could you, if you were the foreperson, sign a verdict?
>
> [Veniremember Coleman]: I don't know.
>
> [Prosecuting Attorney]: Well, you rolled your eyes first, so I kinda thought in my experience, you might say I don't know. Because that can be the weight to your issue. I mean some people feel sometimes that by signing that, I'm the only one responsible for that. And is it fair to say that's kind of what's going through your mind?
>
> [Veniremember Coleman]: Yes.
>
> ...
>
> [Prosecuting Attorney]: And my concern is, is that you might not be able to function as a juror. Do you understand that?
>
> [Veniremember Coleman]: I understand.

> [Prosecuting Attorney]: And—but so what I need you to know is, can you assure me that you can do that. Or, is your situation because of your concerns that ... I just don't know that I can sign that form. I can't promise you that I'll be able to?
>
> [Veniremember Coleman]: I don't know that I could.
>
> [Prosecuting Attorney]: Would it be fair to say that you can't promise me that you would be able to?
>
> [Veniremember Coleman]: No, I can't.

Deck's attorney did not ask Veniremember Coleman any questions. The trial court sustained the State's motion to strike Veniremember Coleman for cause apparently based on her statement—that was not followed up—that she was unable to state whether she could sign the verdict form.

### 2. The Record Regarding Veniremember Ladyman

Veniremember Ladyman also claimed that he could consider both punishments, but said that he would not sign a verdict imposing a death sentence because it was "like playing God":

> [Prosecuting Attorney]: Thank you. Mr. Ladyman. Sir, if you were in that circumstance, asked to consider those things, would you be able to give the same level of consideration to a sentence of death, as a life sentence?
>
> [Veniremember Ladyman]: Yes, I could.
>
> [Prosecuting Attorney]: Would you be able to, also consider or sign the verdict form, sentencing someone—or sentencing someone to die ?
>
> [Veniremember Ladyman]: No.
>
> [Prosecuting Attorney]: And—I don't— is it the same sort of thing we've talked about with others, that it's very personal, and you couldn't stand out alone?

[Veniremember Ladyman]: Well, if—if its like playing God. I don't want to be a part of it, nuh-uh.

[Prosecuting Attorney]: So while you might be able to deliberate and decide—

[Veniremember Ladyman]: Yeah, I can decide.

[Prosecuting Attorney]: And you view that part as playing God?

[Veniremember Ladyman]: Yes.

Veniremember Ladyman maintained this position even though he had heard the prosecutor repeatedly tell others that the jury foreperson signs the verdict form not on behalf of himself or herself, but on behalf of the unanimous jury as a whole.

During questioning by Deck's attorney, Veniremember Ladyman said that he could follow the court's instructions and consider imposing the death penalty or life imprisonment without parole. Deck's counsel also asked him about his statement that he would refuse to sign a verdict form imposing a death sentence. Veniremember Ladyman said that he could consider the death sentence, and also reaffirmed that he would refuse to sign a verdict form for a sentence of death:

[Defense Counsel]: Mr. Ladyman, we also went through the process together. Unless there's something else that you want to mention to me or state that you believe would be helpful in our consideration to consider whether or not you would be appropriate for the jury?

[Veniremember Ladyman]: [Shakes head.]

[Defense Counsel]: You're shaking your head. I'll take that as a no.

[Veniremember Ladyman]: I'm just saying I ain't signing it. I don't want to be the—

[Defense Counsel]: Let me ask you about that. You talked about that you would not sign the verdict form.

[Veniremember Ladyman]: Right.

[Defense Counsel]: Does the fact that you do not want to sign the verdict form, or that you don't want to serve as the foreman of the jury, does that prevent you from being a jury—a juror in this case, in the sense that—my question is in your mind, I can't be a part of that. I can't be a part of that? You are there. But does that prevent you from giving a realistic consideration to the death penalty?

[Veniremember Ladyman]: That's all the time.

[Defense Counsel]: Sure. Is your reluctance—or I'll even call refusal to sign the verdict form, does that prevent you from considering the death penalty in this case?

[Veniremember Ladyman]: No.

[Defense Counsel]: You could be one of the jurors?

[Veniremember Ladyman]: Yeah.

[Defense Counsel]: You would just defer, as I understand it correctly, and have somebody else serve as foreperson?

[Veniremember Ladyman]: Right.

[Defense Counsel]: Correct me if I'm wrong, but you could realistically consider the death penalty?

[Veniremember Ladyman]: Yeah.

[Defense Counsel]: And you could realistically consider the life in prison?

[Veniremember Ladyman]: Yeah.

The trial court sustained the State's motion to strike Veniremember Ladyman for cause.

### Analysis

■■■■■ This Court held in *Smith* that a veniremember's unequivocal statement that he or she could not sign a death verdict can provide a basis for the trial court to sustain a motion to remove the veniremember for cause. 32 S.W.3d at 544. Both veniremembers in question, in

this case, stated that they could not sign a death verdict. A prospective juror's reluctance or refusal to sign a death verdict may be considered by the trial court but need not be conclusive. The reluctance or refusal may be considered among other facts and circumstances—including the judge's observation of the veniremember—in deciding whether a prospective juror should be struck for cause.

In this case, it is not just the simple refusal to sign the verdict that may warrant removal. Where, as here, if a veniremember claims on the one hand that he or she could fairly consider both punishments but, at the same time, unequivocally states that he or she would not sign a verdict of death, the trial court is in the best position to consider whether the record contains sufficient evidence of equivocation creating a doubt as to whether that veniremember would be able to fairly consider both punishments. Here, the veniremembers' responses revealed an inability to follow the court's instructions if that person were chosen as foreman of the jury and the trial court could have concluded from the record as a whole that there was a substantial possibility that the veniremember may not be able to fairly consider both punishments despite their assurances to the contrary. The trial court was in a better position than this Court to make that determination and did not abuse its discretion in sustaining the State's motion to strike these veniremembers for cause.

## IV. Point Three: Failure to Provide Notice of Argument

Deck argues the State failed to provide notice of aggravators, as required by section 565.005.1, RSMo 2000, and Rule 25.03 and that the trial court abused its discretion when it allowed the State to argue Deck's future dangerousness and bad prison conduct based on Deck's 1985 conviction for aiding an escape from incarceration.

### Standard of Review

The trial court is vested with broad discretion to exclude or admit evidence and to control closing arguments. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009); *State v. Forrest*, 183 S.W.3d 218, 226 (Mo. banc 2006). Furthermore, to be entitled to relief, an appellant must show an error was so prejudicial that he or she was deprived of a fair trial. *Baumruk*, 280 S.W.3d at 607.

### Analysis

The State's amended information charged that Deck was a persistent offender. One of the convictions relied on to support that allegation was Deck's 1985 conviction for aiding an escape. When the State offered a certified copy of that conviction during the penalty-phase retrial, Deck's counsel objected on the ground that the conviction was more prejudicial than probative and that the State had not provided notice it would utilize the conviction. The trial court overruled the objection and admitted the certified copy of the conviction into evidence.

Later, during closing arguments, the State discussed Deck's future dangerousness and bad prison conduct:

> [Prosecuting Attorney]: Sometimes when horrible crimes are committed by wolves, we've got to come to court, and we've got to count on our sheepdogs like for you, and you're our sheepdogs, today. You're our sheepdogs, that by your verdict, can protect the rest of society. While he's going to be in prison for the rest of his life if you let him live, remember, he knows how to escape. He aided and abetted others trying to.
>
> [Defense Counsel]: Objection; not a noticed aggravator.
>
> [The Court]: Overruled.
>
> [Defense Counsel]: Irrelevant.

[The Court]: Overruled.

[Prosecuting Attorney]: He knows how to escape, helping people that were in for the rest of their lives. I need you to be the sheepdog. I need you to protect the guards that will have to guard him so that he doesn't injure them. I need you to be a sheepdog and even protect other, more vulnerable inmates. But I need you and our society to be the sheepdog.

Section 565.005.1(1) requires that parties, at a reasonable time before trial begins, provide each other with a list of all aggravating or mitigating circumstances that the party intends to prove at the penalty phase of trial. Rule 25.03 requires the State, on written request, to disclose certain materials and information.

It is clear from the record that the State provided notice that it intended to make arguments based on Deck's 1985 conviction. Deck's argument does not articulate any specific violation of section 565.005.1 or Rule 25.03 and, in fact, his brief concedes notice: "Before trial, the State provided Deck notice that it would offer evidence of his prior convictions, including a 1985 conviction for aiding an escape."

Instead, Deck argues the State's failure to give notice it intended to argue his future dangerousness and previous bad prison conduct violated section 565.005.1 and Rule 25.03 as well as his due process rights under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

■ Section 565.005.1 and Rule 25.03 do not require the State to provide notice of arguments it plans to make. Section 565.005.1 requires disclosure of aggravating or mitigating circumstances that either party intends to prove at the penalty phase of trial. Rule 25.03 requires disclosure, on request, of certain types of evidence or information. Neither requires

notice of the specific argument that is going to be made based on disclosures.

Deck's reliance on *Simmons* is misplaced. In *Simmons,* the United States Supreme Court found that the due process clause does not allow the execution of a person on the basis of information that he had no opportunity to explain or deny. 512 U.S. at 163–64, 114 S.Ct. 2187. The Supreme Court held that a defendant who was sentenced to death and whose future dangerousness was made an issue by the State was denied due process when it prevented him from providing mitigating evidence or argument during the penalty phase of trial. *Id.* The case before this Court is distinguishable. There is no evidence that Deck was prevented from making any mitigating argument.

Furthermore, the State's disclosure placed Deck on notice that the State was likely to argue his future dangerousness. In *State v. Bucklew,* 973 S.W.2d 83, 96 (Mo. banc 1998), Bucklew argued that the trial court plainly erred in permitting the State to make arguments based on aggravating circumstances because the State failed to disclose aggravating circumstances and failed to give him notice it would argue his future dangerousness based on those circumstances. This Court rejected his claim, finding that the State had given Bucklew notice of statutory and non-statutory aggravating circumstances. *Id.* This Court also found that Bucklew had notice of the State's arguments, based on its disclosure of aggravating circumstances:

[T]he state may argue inferences from evidence. It is reasonable to infer that a person who escaped from jail while awaiting a first degree murder trial and who has a long criminal record would not suffer confinement well. The allegations of fact contained in the state's disclosures and the language the state used

("anti-social and criminal history") provided Bucklew with sufficient notice of the state's intent to argue future dangerousness.

*Id.*

### V. Point Four: Allegedly Improper Closing Arguments

Deck makes multiple claims related to the State's closing argument. They include: allegedly improper appeals to the jury, allegedly improper personalization, misstatements of facts and the State's future dangerousness argument.

#### 1. Allegedly improper appeals to the jury

Deck alleges this portion of the closing argument was improper personalization:

[Prosecuting Attorney]: The last thing I'm gonna tell you and say to you is this: I—I've done this job long enough, and this isn't about me—but I've done this long enough that on occasion, five years after a case like this has gone—

[Defense Counsel]: Objection; vouching, personalization.

[The Court]: Sustained.

[Prosecuting Attorney]: Often times, I'll get a phone call later on from a family member, and they'll say—

[Defense Counsel]: Objection; relevance, same objection.

[The Court]: Overruled.

[Prosecuting Attorney]: And they'll say to me, to my granddaughter, I've told them about my loved one that was murdered. They want—they want to know what happened. Can you explain it to them. There are 19 grandchildren. 19 great-grandchildren, and I don't know how many more there'll be. And some day these people are going to be told about James and Zelma Long. And they're gonna be told about what wonderful parents they were, how they liked to fish. How their Grandmother got her masters and taught. They're gonna be

told about these wonderful people. And you know the question they're gonna ask, is they're gonna say well, where are they now? They're gonna have to be told about this. And then they're gonna ask another question, and that question I get to some—unfortunately sometimes explain is was justice done? When you go up there, you'll tell us if justice is done. Now I'm gonna sit down and wait for your answer, so I can tell them.

### Standard of Review

The trial court maintains broad discretion in controlling closing arguments. *State v. Edwards,* 116 S.W.3d 511, 537 (Mo. banc 2003). Closing arguments must be examined in the context of the entire record. *Id.* Here, Deck's claim of improper personalization was preserved and will be reviewed for abuse of discretion—whether a defendant was prejudiced to the extent that there is a reasonable probability that the outcome at trial would have been different if the error had not been committed. *Deck III,* 136 S.W.3d at 488; *Deck I,* 994 S.W.2d at 543.

### Analysis

■■■■ This argument did not constitute improper personalization. Improper personalization is established when the State suggests that a defendant poses a personal danger to the jurors or their families. *State v. Basile,* 942 S.W.2d 342, 352 (Mo. banc 1997). "Arguing for jurors to place themselves in the shoes of a party or victim is improper personalization that can only arouse fear in the jury." *State v. Williams,* 97 S.W.3d 462, 474 (Mo. banc 2003) (internal quotations omitted). The record here shows that the State did not imply any danger to the jurors or ask the jurors to place themselves in the victims' shoes.

In addition to his improper personalization argument, Deck attempts to tack on an additional claim, alleging this argument constituted an improper appeal to sympathy and that it asked jurors to consider matters outside of the record to reach their verdict. Because this additional claim differs from his objection at trial, it is not preserved for appellate review and is entitled only to plain error review. *State v. Driver,* 912 S.W.2d 52, 54 (Mo. banc 1995).

▋ Deck claims this argument was an improper appeal to sympathy akin to the argument in *Sheppard v. State,* 777 So.2d 659, 661 (Miss.2000), where the prosecutor told the jury that if they voted to acquit, he would want them to call him and explain why they found the defense witnesses credible, so he could explain it to the victim's family. The Mississippi Supreme Court found that argument was reversible error because its purpose was to inflame the jurors and make them believe they would be held personally accountable for their verdict. *Id.* at 661–62.

The closing argument in this case is distinguishable from that in *Sheppard* because the prosecuting attorney did not tell the jurors that the victims' family would hold them accountable, nor did he attempt to make an improper appeal to sympathy. In fact, the closing argument in this case is closer to the argument upheld by this Court in *State v. Strong,* 142 S.W.3d 702, 726–27 (Mo. banc 2004), where the State argued that family members in the courtroom were victims and described the impact the crime had on them.

This Court has found that statements stronger than those made here were not plain error. *See, e.g., Strong,* 142 S.W.3d at 727–28 (telling jurors the defendant would "escape justice" if death were not imposed); *State v. Ringo,* 30 S.W.3d 811, 821 (Mo. banc 2000) (telling jurors they would be rewarding the defendant if they

did not impose death); *Deck I,* 994 S.W.2d at 543–44 (telling the jury the only way they could impose justice and show mercy to the people in the courtroom was to impose death).

**2. Allegedly improper personalization**

▋ Deck alleges this closing argument was improper personalization:

> Fourth—or three, depravity of mind. Is this the act of a depraved mind? And the instruction goes a little bit further than this. But it tells you what depraved mind in this situation means. But he rendered these people helpless before he killed them. And I would ask you to think about this: laying on a bed for ten minutes at gunpoint, rendered you helpless.

### Standard of Review

▋ No objection was made to this argument. Therefore, this claim is only entitled to plain error review. *State v. Johnson,* 284 S.W.3d 561, 573 (Mo. banc 2009). Plain error relief is rarely appropriate for claims involving closing arguments because the decision to object is often a matter of trial strategy. *Id.* Closing arguments must be examined in the context of the entire record. *Id.* Under plain error review, a conviction will be reversed for improper closing argument only when it is established that the argument had a decisive effect on the outcome of the trial and amounts to manifest injustice. *State v. Middleton,* 995 S.W.2d 443, 456 (Mo. banc 1999). The burden to prove decisive effect is on the appellant. *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993).

### Analysis

Deck's argument relies on *State v. Storey,* 901 S.W.2d 886 (Mo. banc 1995), and

*State v. Rhodes*, 988 S.W.2d 521 (Mo. banc 1999).

The State in *Storey* argued:

Think for just this moment. Try to put yourselves in Jill Frey's place. Can you imagine? And, then—and then, to have your head yanked back by its hair and to feel the blade of that knife slicing through your flesh, severing your vocal cords, wanting to scream out in terror, but not being able to. Trying to breathe, but not being able to for the blood pouring down into your esophagus.

*Id.* at 901.

This Court held the State's argument was improper and undeniably prejudicial because graphically detailing the crime as if the jurors were in the victim's place could only serve to arouse fear in the jury. *Id.*

In *Rhodes*, the State argued:

Try, try just taking your wrists during deliberations and crossing them and lay down and see how that feels (demonstrating). Imagine your hands are tied up.... And ladies and gentlemen, you're on the floor, and you're like that, with your hands behind your back, and this guy is beating you. Your nose is broken. Every time you take a breath, your broken rib hurts. And finally, after you're back over on your face, he comes over and he pulls your head back so hard it snaps your neck.... Hold your breath. For as long as you can. Hold it for 30 seconds. Imagine it's your last one.

988 S.W.2d at 529.

This Court, relying on *Storey*, stated that graphically detailing the crime as if the jurors were the victims was improper because it interfered with the jury's ability to make a reasoned and deliberate determination to impose the death penalty. *Id.*

The argument here is distinguishable from those made in *Storey* and *Rhodes*. In this case, the jury was not asked in any manner to place itself in the victims' shoes. This Court has denied similar claims in other cases. *See, e.g., State v. Smith*, 944 S.W.2d 901, 918 (Mo. banc 1997); *Roberts*, 948 S.W.2d at 594–95.

### 3. Misstatement of facts

Deck contends the State made two arguments that prejudicially misstated the facts of the case. Deck's complaint lies with the following two arguments related to his 1985 conviction for aiding escape:

The next thing we have to do is to convince you that all this bad evidence, the aggravating evidence in this case warrants a death sentence. It does. You can consider all his prior escapes. . . .

He knows how to escape, helping people that were in for the rest of their lives. I need you to be the sheepdog. I need you to protect the guards that will have to guard him so that he doesn't injure them. I need you to be a sheepdog and even protect other, more vulnerable inmates.

### Standard of Review

No objection was made to either argument; therefore, they will be reviewed for plain error, which is established only when an argument has a decisive effect on the outcome of the trial amounting to a manifest injustice. *Johnson*, 284 S.W.3d at 573; *Middleton*, 995 S.W.2d at 456. The burden to prove decisive effect is on the appellant. *Parker*, 856 S.W.2d at 333.

### Analysis

The only evidence before the jury relating to any escape attempt was the State's allegation that, in 1985, while incarcerated, Deck procured a saw blade to cut through

jail bars to help two men to escape. The record also contains information that Deck attempted to escape from prison in Potosi, but that evidence was discussed at sidebar outside the presence of the jury.

■■■■ The State has wide latitude in closing arguments, but closing arguments must not go beyond the evidence presented; courts should exclude "statements that misrepresent the evidence or the law, introduce irrelevant prejudicial matters, or otherwise tend to confuse the jury." *State v. Rush*, 949 S.W.2d 251, 256 (Mo.App. 1997); *see also Storey*, 901 S.W.2d at 901 ("A prosecutor arguing facts outside the record is highly prejudicial"). But it is important to remember that "[t]he entire record is considered when interpreting a closing argument, not an isolated segment." *Johnson*, 284 S.W.3d at 573.

■■■■ No prejudice resulted from the first argument that suggested Deck had escaped more than one time. It appears the prosecuting attorney's comment was a simple misstatement—he used the plural rather than the singular form of the word "escape." Deck argues that based on this mistake, the jurors speculated, assumed facts outside of evidence and then imposed the death sentences based on that one comment. Comments made during closing argument must be looked at in the context of the entire record. *Id.* After review of the entire record there is no demonstration Deck was prejudiced by this misstatement.

■■■■ No prejudice resulted from the second argument that suggested the other inmates whom Deck attempted to help escape were serving life sentences. There was no evidence that the inmates Deck aided were "in for the rest of their lives," but the jury was aware he previously had participated in an escape. After review of the entire record, this comment was not prejudicial because there is no basis to conclude that this argument had a decisive effect on the outcome of the trial.

**4. Future dangerousness argument**

■■■■ Deck alleges this portion of the State's closing argument was improper:

He knows how to escape, helping people that were in for the rest of their lives. I need you to be the sheepdog. I need you to protect the guards that will have to guard him so that he doesn't injure them. I need you to be a sheepdog and even protect other, more vulnerable inmates.

**Standard of Review**

No objection was made to this argument. Deck's claim will be reviewed for plain error—whether the argument had a decisive effect on the outcome of the trial amounting to a manifest injustice. *Johnson*, 284 S.W.3d at 573; *Middleton*, 995 S.W.2d at 456. The burden to prove decisive effect is on the appellant. *Parker*, 856 S.W.2d at 333.

**Analysis**

■■■■ Deck relies on *Schoels v. State*, 114 Nev. 981, 966 P.2d 735 (1998), and *Blake v. State*, 121 Nev. 779, 121 P.3d 567 (2005), and claims this argument impermissibly asked jurors to impose death to prevent him from killing others in the future, thereby saving innocent victims. However, one of the purposes of capital punishment is the incapacitation of dangerous criminals and "the consequent prevention of crimes that they may otherwise commit in the future." *State v. Bolder*, 635 S.W.2d 673, 683 (Mo. banc 1982) (citing *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

In *Simmons*, the United States Supreme Court noted its approval of arguments concerning a defendant's future dangerousness, "This Court has approved

the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." 512 U.S. at 162, 114 S.Ct. 2187; *see also Bucklew,* 973 S.W.2d at 96.

The facts in this case are distinguishable from *Schoels* and *Blake* in that the State, as permitted by *Bucklew* and *Simmons,* permissibly argued future dangerousness but did not suggest or imply the jurors would be directly responsible or held accountable if Deck harmed anyone else in the future.

## VI. Point Five: Motion to Suppress

■ Deck argues that the trial court erred in overruling his motion to suppress evidence—which addressed items seized from his car and subsequent statements made to police—because the police did not have reasonable suspicion to stop him. He claims that this evidence was obtained in violation of his constitutional right to be free of unreasonable searches and seizures and that the impermissible use of this evidence, first at trial and again during the most recent penalty-phase retrial, requires that his conviction and sentences be vacated and remanded for a new trial.

### Standard of Review

■ When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether substantial evidence supports the court's decision. *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). The appellate court views the facts and any reasonable inferences in a light most favorable to the trial court and disregards any contrary inferences. *State v. Lewis,* 17 S.W.3d 168, 170 (Mo.App.2000).

### Analysis

Deck unsuccessfully raised this same issue in his first direct appeal. *See Deck I,*

994 S.W.2d at 534–35. In *Deck I,* he argued that he was seized when Officer Wood approached his car and that there was no probable cause, at that time, because it was not unlawful to drive in a private parking lot without turning on his car's headlights. *Id.* at 535.

At the first trial, Officer Wood testified he parked on the road outside Deck's apartment after receiving a tip that Deck and his sister were involved in a robbery-homicide, that they were driving a gold two-door car and that they were probably armed. *Id.* Sometime after 11 p.m., Officer Wood saw Deck drive by and pull into a parking space. *Id.* Officer Wood testified the lights on Deck's car were not turned on, even though it was dark outside. *Id.* Officer Wood approached the car, identified himself and shined a flashlight on Deck. *Id.* Deck leaned down to the passenger's side of the vehicle, at which point Officer Wood ordered him to sit up and show his hands. *Id.* Officer Wood ordered Deck out of the car, searched him, found no weapons, and then searched his car, finding a pistol concealed under the front seat. *Id.* Officer Wood placed Deck under arrest for unlawful use of a weapon. *Id.* Also found in the car was a decorative tin belonging to the victims. *Id.* Deck later, after receiving the *Miranda* warning, made a full confession. *Id.*

This Court affirmed the trial court's ruling admitting the evidence because Deck was not seized, for purposes of the Fourth Amendment, until he was ordered to sit up and show his hands. *Id.* at 535–36. This seizure was based on reasonable suspicion because Officer Wood had observed Deck leaning into the passenger's seat. *Id.* Deck's search and subsequent seizure of items found in the car, as well as his confessions, were permissible, therefore, following the United State's Supreme Court's decisions in *Terry v. Ohio,* 392

U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) and *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). *Id.*

 The law-of-the-case doctrine [2] precludes reexamination of this issue. *State v. Johnson*, 244 S.W.3d 144, 163 (Mo. banc 2008).

Deck requests that this Court not apply the law-of-the-case doctrine, claiming the evidence on remand concerning his arrest was substantially different from the evidence supporting his conviction in the first appeal. "An appellate court has discretion to refuse to apply the doctrine where the first decision was based on a mistaken fact or resulted in manifest injustice or where a change in the law intervened between appeals." *Walton v. City of Berkeley*, 223 S.W.3d 126, 130 (Mo. banc 2007). Furthermore, the law-of-the-case doctrine has been held not to apply where the evidentiary facts on remand are "substantially different from those vital to the first adjudication and judgment." *Id.*

Deck argues the evidence on remand was substantially different because Officer Wood testified at the first trial that when Deck drove past him, the headlights on his car were off. *See Deck I*, 994 S.W.2d at 535. However, at the most recent penalty-phase trial, Officer Wood testified that Deck turned his lights off as he drove by and before he pulled into the parking spot.

This slight factual difference in Officer Wood's testimony of an event that happened more than a decade ago does not establish manifest injustice or constitute facts substantially different from the first adjudication. In *Deck I*, this Court began

its search and seizure analysis at the point that Officer Wood approached Deck's car and saw him lean over to the passenger's seat. 994 S.W.2d at 535–36. Whether Deck's lights were on or off does not change this analysis; accordingly, this Court does apply the law-of-the-case doctrine.

## VII. Point Six: Failure to Read Instruction

██ Deck argues the trial court erred in failing to read MAI–CR 3d 300.03A before death qualification of the venire panel, which resulted in manifest injustice because the jury was unable to respond appropriately to questioning during death qualification.

### Standard of Review

 "Whenever there is an MAI–CR instruction applicable under the law . . ., the MAI–CR instruction is to be given to the exclusion of any other instruction." *State v. Ervin*, 979 S.W.2d 149, 158 (Mo. banc 1998). Error results when a trial court fails to give a mandatory instruction. *State v. Gilmore*, 797 S.W.2d 802, 805 (Mo. App.1990). However, Deck did not object when the trial court failed to read MAI–CR 3d 300.03A at the beginning of death-qualification voir dire. Therefore, this issue has not been preserved for appeal and can only be reviewed for plain error, which requires a finding that the trial court's error resulted in manifest injustice or miscarriage of justice. *Johnson*, 244 S.W.3d at 162.

### Analysis

MAI–CR 3d 313.00 Supp. Notes on Use 6(a)(1)(b) states that when a defendant has

---

**2.** A previous holding is the "law-of-the-case," precluding re-litigation of issues on remand and subsequent appeal. " '[T]he decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not.' " *State v. Graham*, 13 S.W.3d 290, 293 (Mo. banc 2000) (citing *Shahan v. Shahan*, 988 S.W.2d 529, 533 (Mo. banc 1999)).

been found guilty of first-degree murder committed after August 28, 1993, but before August 28, 2001, MAI–CR 3d 300.03A, "with modification, must be read to the jury panel immediately before the commencement of the 'death qualification' phase of voir dire."[3] That instruction provides:

At this stage of the jury selection process, the attorneys are permitted to question you concerning your views on punishment. The fact that questions are being asked about punishment at this time should not be taken by you as any indication that the defendant(s) in the case before you (is)(are) guilty of the crime(s) charged. Nothing that is said by the attorneys or by another prospective juror during this process is evidence, and you should not let any such statements influence you in any way.

The possible punishments for the offense of murder in the first degree are imprisonment for life by the Department of Corrections without eligibility for probation or parole or death. The purpose of this questioning is to discover whether or not you are able to consider both of these punishments as possible punishments.

A case in which the death penalty is a possible punishment is tried in two stages. In the first stage, the jury must decide whether the defendant is guilty or not guilty. If the defendant is found guilty of murder in the first degree, a second stage is held in which the jury must decide on appropriate punishment.

If a second stage is reached in this case, the Court will instruct the jury as to the process it must follow to reach its decision on punishment. For present purposes, you should be aware that a conviction of murder in the first degree does not automatically make the defendant eligible for the death penalty. Be-

fore the jury may consider imposing the death penalty, it may be asked to consider whether or not the defendant is mentally retarded. If the jury unanimously finds that it is more likely to be true than not true that the defendant is mentally retarded, the defendant cannot be sentenced to death.

Before the jury may consider imposing the death penalty, it must also find, unanimously and beyond a reasonable doubt, that the evidence before it establishes the existence of at least one special fact or circumstance specified by law, called a statutory aggravating circumstance. If no statutory aggravating circumstance is found, the defendant cannot be sentenced to death.

If the jury does not find at least one statutory aggravating circumstance, it still cannot return a sentence of death unless it also unanimously finds that the evidence in aggravation of punishment, taken as a whole, warrants the death penalty, and that this evidence is not outweighed by evidence in mitigation of punishment. The jury is never required to return a sentence of death.

Counsel for the State may proceed.

This instruction was not read. As a result, Deck argues the jury was not able to appropriately respond to questioning during voir dire because: (1) the jury was not instructed that a finding of aggravating circumstances had to be unanimous or that aggravating circumstances must outweigh mitigating circumstances; (2) the jury was not instructed that a first-degree murder conviction does not automatically make a defendant eligible for death or that the jury was not required to return a sentence of death; and (3) the court's failure to give these instructions gave the jury a false impression that certain steps in the deliberation process were more important.

---

**3.** In this case, modifications would have re- moved references to the guilt phase of trial.

Deck suffered no manifest injustice from the failure to read this oral instruction because the information that would have been conveyed to the veniremembers by the instruction was otherwise provided. Immediately after the jury panel was sworn, the trial court read the opening instruction to the panel, part of which stated:

The Court instructs you that, in order to consider the death penalty, you must find one or more statutory aggravating circumstances beyond a reasonable doubt. The burden of causing you to find the statutory aggravating circumstances beyond a reasonable doubt is upon the State.

Later, during voir dire, Deck's attorney told the jury panel that "this is a capitol [sic] case" and that the panel members would be asked about the "issue specifically of life in prison without the possibility of parole or the alternative, the death penalty." Deck's attorney also told the jury panel they would "talk about the issue of the death penalty and ... life in prison without parole." After general voir dire, the trial court told the jury panel they would be questioned in smaller panels about their "attitudes regarding the punishments that are available in this case."

When each small jury panel was questioned, its members were told that a person must first be convicted of first-degree murder before a death sentence can be considered and that Deck had previously been convicted of two counts of first-degree murder. Each small jury panel was told the only available sentences were death and life imprisonment without parole and that the purpose of questioning was to determine whether they could realistically consider both punishments.

All the jury panels were told that before a death sentence can be considered: (1) the State must prove at least one statutory aggravating circumstance beyond a rea-

sonable doubt, which the jury must unanimously agree on; (2) the jury must then also determine whether the aggravating circumstances as a whole justified a death sentence; and (3) the jurors must also conclude that the aggravating circumstances outweigh any mitigating circumstances.

All the jury panels were told that a juror is never required to vote for death and that the failure to unanimously make the required findings would automatically result in a sentence of life imprisonment without parole. Throughout this entire process, phrases and concepts unfamiliar to lay people, including statutory aggravating and mitigating circumstances, were explained in easy-to-understand language.

The only circumstance covered by MAI–CR 3d 300.03A, but not covered by the court or counsel in the form of an oral statement or instruction, was the issue of mental retardation. Because mental retardation was not an issue in this case, no prejudice results from this omission. Otherwise, the information contained in the instruction was conveyed to the jury by attorneys or the court before death qualification began. Therefore, the trial court's failure to read MAI–CR 3d 300.03A did not result in plain error.

Other cases before this Court have reached a similar conclusion—the failure to read a mandatory instruction did not result in plain error if the jury was otherwise conveyed the information. *See, e.g.,* *Williams,* 97 S.W.3d at 472 (failure to give the jury an instruction on notetaking was technically erroneous, but not plain error because the court read the proper instruction to the jury).

## VIII. Point Seven: Instructional Error—Mitigating Evidence

Deck argues the trial court erred in submitting instructions 8 and 13 to the

jury. He contends these instructions did not inform the jury that the State bore the burden of proving aggravating circumstances beyond a reasonable doubt and that aggravation had to outweigh mitigation, thereby preventing the jury from giving meaningful consideration and effect to mitigating evidence. Deck claims the instructions effectively impermissibly shifted the burden of proof.

### Standard of Review

■ This Court will reverse on a claim of instructional error only if there is an error in submitting an instruction and that error results in prejudice to the defendant. *State v. Zink*, 181 S.W.3d 66, 74 (Mo. banc 2005).

### Analysis

At the instructions conference, Deck objected to instructions 8 and 13 on the grounds that these instructions impermissibly shifted the burden of proof to the defendant with respect to mitigating evidence. The instructions given were patterned after MAI–CR 3d 313.44A and explained to the jurors if they found the facts and circumstances in aggravation of punishment taken as a whole warrant a death sentence, they must then determine if there were facts or circumstances in mitigation of punishment that were sufficient to outweigh those in aggravation of punishment. The instruction then explains to the jurors that they did not have to agree on mitigating facts, but that if each juror determined that the mitigating evidence outweighs the aggravating evidence, the jury must return a sentence of life without parole.

Deck concedes this Court has previously addressed this argument and rejected it. *See Johnson*, 284 S.W.3d at 588–89 (The

appellant's argument that the mitigating evidence instruction "improperly shifts the burden of proof has been rejected by the United States Supreme Court [in *Kansas v. Marsh*, 548 U.S. 163, 170–71, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006)] and this Court."); *see also Forrest*, 183 S.W.3d at 228–29; *Zink*, 181 S.W.3d at 74. Deck offers no meritorious reason why this Court should reconsider its holding in those cases.

■ Furthermore, in *Deck III*, Deck challenged the mitigating evidence instructions and this Court rejected his claim; Deck's claim is barred by the law-of-the-case doctrine. *Deck III*, 136 S.W.3d at 486; *Johnson*, 22 S.W.3d at 189.

## IX. Point Eight: Instructional Error—Burden of Proof

Deck argues the trial court erred in submitting instructions 3, 7, 8, 12 and 13 to the jury.[4] He contends these instructions failed to instruct jurors that the State bore the burden of proving beyond a reasonable doubt that the aggravating facts and circumstances warranted a death sentence and that the evidence in mitigation was insufficient to outweigh the evidence in aggravation.

### Standard of Review

This Court will reverse on a claim of instructional error only if there is an error in submitting an instruction and that error results in prejudice to the defendant. *Zink*, 181 S.W.3d at 74. The instructions given were patterned after MAI–CR 3d and are presumptively valid under Rule 28.02(c). *Id.* ("MAI instructions are presumptively valid and, when applicable,

---

4. Deck's challenge to instructions 8 and 13 formed the basis for his claim raised in his seventh point.

must be given to the exclusion of other instructions").

## Analysis

During the instructions conference, Deck objected to instructions 3, 7, 8, 12 and 13. Instruction 3 was patterned after MAI–CR 3d 313.30A and instructed the jury that the burden is on the State to prove statutory aggravating circumstances beyond a reasonable doubt. Instructions 7 and 12, patterned after MAI–CR 3d 313.41A, instructed the jury that if it had determined that one or more aggravating circumstances existed, it was next to consider whether the facts and circumstances in aggravation of punishment taken as a whole were sufficient to warrant imposing a sentence of death. Instructions 8 and 13, patterned after MAI–CR 3d 313.44A, instructed the jury that if it had found that the facts and circumstances in aggravation of punishment taken as a whole warranted a death sentence, it must then determine if there were facts or circumstances in mitigation of punishment sufficient to outweigh those in aggravation of punishment. They then instructed jurors that they did not have to agree on mitigating facts, but that if each juror determined that the mitigating evidence outweighed the aggravating evidence, the jury must return a sentence of life in prison without parole.

Deck concedes this Court has previously addressed this argument and rejected it. *See Johnson,* 284 S.W.3d at 584–85 (holding that the reasonable doubt standard does not apply to mitigating evidence or non-statutory aggravating factors and that under *Ring* and *Apprendi* only evidence functionally equivalent to an element, including statutory aggravating circumstances, must be found beyond a reasonable doubt); *see also State v. Johnson,* 207 S.W.3d 24, 47 (Mo. banc 2006).

## X. Point Nine: Statutory Aggravating Circumstances Not Pleaded in the Information

Deck alleges the trial court erred in sentencing him to death because the State failed to plead statutory aggravating circumstances in the information.

The State's amended information did not allege which statutory aggravating circumstances the State intended to prove. Prior to trial, pursuant to section 565.005.1, the State provided written notice to Deck of the statutory aggravating circumstances it would attempt to prove at trial.

Before trial, Deck filed a motion to quash the information, to require the State to include statutory aggravating circumstances in the information or to preclude the State from seeking the death penalty on constitutional grounds due to the State's failure to include the statutory aggravating circumstances in the information. The trial court overruled this motion.

## Analysis

Deck raised an identical claim in *Deck III,* which this Court rejected:

This Court has addressed this claim numerous times before. The omission of statutory aggravators from an indictment charging the defendant with first degree murder does not deprive the sentencing court of jurisdiction to impose the death penalty. Missouri's statutory scheme recognizes a single offense of murder with maximum sentence of death, and the requirement that aggravating facts or circumstances be present to warrant imposition of death penalty does not have the effect of increasing the maximum penalty for the offense.

136 S.W.3d at 490. This claim is barred by the law-of-the-case doctrine. *Johnson,* 22 S.W.3d at 189.

Furthermore, this Court has consistently rejected this argument. *See, e.g., Johnson,* 284 S.W.3d at 589; *Baumruk,* 280 S.W.3d at 617–18; *Zink,* 181 S.W.3d at 74–75. Deck concedes this point and offers no meritorious reason why this Court should reconsider its holdings in those cases.

## XI. Point Ten: Proportionality Review

### Standard of review

This Court independently reviews Deck's death sentences under section 565.035, RSMo 2000. This Court must determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Section 565.035.3.

■ This Court's proportionality review is designed to prevent freakish and wanton application of the death penalty. *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo. banc 1993).

### 1. Influence of prejudice

Three separate juries—thirty-six jurors in all—viewing essentially the same evidence have unanimously concluded that death is the appropriate sentence for Deck. Nothing in the record suggests Deck has been sentenced under the influence of prejudice, passion, or any other improper factor.

### 2. Aggravating factors

The evidence supports the jury's finding beyond a reasonable doubt of six statutory aggravating factors. In fact, all three juries—thirty-six jurors—have found the same six factors:

(1) Each murder was committed while the defendant was engaged in the commission of another unlawful homicide, § 565.032.2(2).

(2) The murders were committed for the purpose of receiving money or any other thing of monetary value, § 565.032.2(4).

(3) The murders were outrageously and wantonly vile, horrible, and inhuman in that they involved depravity of mind, § 565.032.2(7).

(4) The murders were committed for the purpose of avoiding a lawful arrest, § 565.032.2(10).

(5) The murders were committed while defendant was engaged in the perpetration of burglary, § 565.032.2(11).

(6) The murders were committed while defendant was engaged in the perpetration of robbery, § 565.032.2(11).

Moreover, in both previous appeals, this Court held that, from its review of the record, the evidence "amply supports the statutory aggravators found by the jury." *Deck I,* 994 S.W.2d at 545; *Deck III,* 136 S.W.3d at 489–90.

### 3. Proportionality

Deck argues this Court should apply the same *de novo* review—based on the Eighth Amendment's prohibition against excessive fines—utilized by the United States Supreme Court in *Cooper Indus., Inc. v. Leatherman Tool Group Inc.,* 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), to review the constitutional validity of a jury's award of punitive damages. This argument is not supported by precedent of the United States Supreme Court and this Court and will not be adopted.

■ This Court's proportionality review was "designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote the evenhanded, rational and consistent imposition of death sentences." *Ramsey*, 864 S.W.2d at 328; section 565.035. This Court simply reviews the sentence and, while giving due deference to the factual determinations reached below, decides whether the sentence is disproportionate as a matter of law.

Deck also claims this Court's proportionality review is fatally flawed because it considers only cases in which death was imposed instead of all factually similar cases. This argument has been repeatedly rejected by this Court. *See, e.g., Johnson,* 207 S.W.3d at 50–51; *Smith,* 32 S.W.3d at 559; *State v. Clay,* 975 S.W.2d 121, 146 (Mo. banc 1998). Deck does not base this argument on the statutory language of section 565.035 and offers no meritorious reason why this Court should reconsider its holding in those cases.

The concurring opinion of Judge Stith contends that this Court has incorrectly conducted proportionality review beginning in 1993 with *Ramsey.* The concurring opinion concedes that *Ramsey* correctly held that the United States Supreme Court had held proportionality review was not constitutionally required. The issue in *Ramsey* that the concurring opinion disagrees with is the holding that proportionality review only requires review of similar cases that resulted in a death sentence. This holding in *Ramsey* was unanimous and has not been questioned in any principal, concurring, or dissenting opinion by

any member of this Court in seventeen years.

The gist of the concurring opinion, which was not an argument articulated in Deck's brief, is that because section 565.035.6 requires the assistant appointed to accumulate the records of all cases in which the sentence of death or life imprisonment without probation or parole was imposed, then the legislature must have intended that this Court's proportionality review require comparisons of cases where both a death sentence and a life sentence without probation and parole was imposed.

That is not the case. Section 565.035.5 simply states that this Court's "decision [makes] reference to those similar cases which it took into consideration." Section 565.035.6 provides that the assistant to this Court shall provide whatever extracted information the Court desires with respect to the information it collects. Finally, that section provides that the Court shall determine what staff and methods are necessary to compile "such data as are deemed by the supreme court to be appropriate and relevant to the statutory questions concerning the validity of the sentence." Read as a whole, these provisions demonstrate that the legislature expressly left to this Court the determination of what cases are similar. Quite simply, the language of the statute relied on by the concurring opinion merely reflected nothing more than the methodology this Court was then using to compile records and is still contained in Rule 29.08(c).[5]

Further, an additional obvious response to the concurring opinion's statement of what the legislature's intention was, as it relates to this issue, is that the legislature

---

5. Rule 29.08(c) states:
 When there is a conviction for a crime for which a punishment provided by statute is death, the judge shall file a report in this Court not later than ten days after the final

imposition of sentence regardless of the sentence actually imposed. The report shall be on a form prescribed by this Court and shall be accompanied by any presentence investigation report.

is presumed to be aware of this Court's 17–year–old decision in *Ramsey*. *Ramsey* expressly stated the statutory review provided for in section 565.035 "merely provides a backstop against the freakish and wanton application of the death penalty" and only requires consideration of similar cases in which a death sentence was imposed. *Ramsey*, 864 S.W.2d at 328.[6]

The circumstances concerning the appropriateness of imposing the death sentence is a very serious and ongoing public concern. It would certainly be a rare scenario that the legislature would leave these express statements in the *Ramsey* case unaddressed for 17 years if this Court's holdings in *Ramsey* were contrary to what the legislature intended. Our legislature has, in fact, been quick to make clear its intent in response to this Court's pronouncements. *See, e.g., Schoemehl v. Treasurer of Missouri*, 217 S.W.3d 900 (2007).

 In this case, the sentence of death is not excessive or disproportionate. The retrial of the penalty phase in this case involves virtually the same evidence as prior trials. In Deck's previous appeals, this Court held that his previous death sentences were not excessive or disproportionate. *Deck I*, 994 S.W.2d at 545 ("[I]mposition of the death penalty in this case is clearly not excessive or disproportionate. The strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Deck's favor"); *Deck III*, 136 S.W.3d at 490 ("The death sentences in this case are neither excessive nor disproportionate to the penalty imposed in similar cases, considering the

crime, the strength of the evidence, and the defendant").

Furthermore, this Court's opinions in *Deck I* and *Deck III* cite numerous opinions in which the death penalty was imposed when "the defendant murdered multiple victims, acted for pecuniary gain, or when the defendant sought to eliminate possible witnesses to avoid a lawful arrest." *Deck III*, 136 S.W.3d at 490 n. 30 (citing *Ringo*, 30 S.W.3d at 811; *State v. Worthington*, 8 S.W.3d 83, 93 (Mo. banc 1999); *State v. Middleton*, 998 S.W.2d 520 (Mo. banc 1999)); *see also Deck I*, 994 S.W.2d at 545 ("There are numerous Missouri cases where, as here, the death penalty was imposed on defendants who murdered more than one person.") (citing *State v. Johnson*, 968 S.W.2d 123 (Mo. banc 1998); *State v. Clemons*, 946 S.W.2d 206 (Mo. banc 1997); *Ramsey*, 864 S.W.2d at 320; *State v. Mease*, 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell*, 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese*, 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan*, 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988); and *State v. Young*, 701 S.W.2d 429 (Mo. banc 1985)).

 Deck suggests the mitigating evidence presented at trial warrants sufficient grounds to set aside his death sentences. The mitigating evidence offered was similar to that offered in the previous trials. That evidence did not provide sufficient grounds to set aside the death sentences. *Deck I*, 994 S.W.2d at 545; *Deck*

---

**6.** Judge Stith's concurring opinion, without discussion of *State v. Edwards*, 116 S.W.3d 511, 549 (Mo. banc 2003), states "section 565.035 does not permit this Court to limit its analysis to a determination whether imposition of the death penalty was freakish or wanton." *State v. Edwards*, authored by

Judge Stith, notes that this Court's role in proportionality review is "to act as a safeguard by ensuring that a sentence of death is not imposed in a case in which to do so is freakish and disproportionate...." The statute has not changed since *Edwards* was decided.

*III,* 136 S.W.3d at 490. In this retrial, a child psychiatry expert and a child development expert testified that Deck's childhood experience had an adverse effect on his development. Both experts, however, testified Deck knew right from wrong and committed these crimes by choice. A bad or difficult childhood does not provide sufficient grounds to set aside a death penalty. *State v. Brooks,* 960 S.W.2d 479, 503 (Mo. banc 1997).

Deck argues his sentence is disproportionate when compared to *State v. McIlvoy,* 629 S.W.2d 333 (Mo. banc 1982), in light of the fact that he confessed to his crimes. In *McIlvoy,* the defendant was convicted of capital murder and sentenced to death for his role in the murder of Gilbert Williams. *Id.* at 334–35. Gilbert Williams' murder was planned by his wife, Vicky Williams, and executed by five men. *Id.* at 335. In return for the murder, Vicky Williams had promised money and drug connections. McIlvoy participated in the murder by shooting Gilbert Williams five times. *Id.* at 335–36.

This Court's proportionality review set aside McIlvoy's death sentence, finding the sentence excessive and disproportionate considering the crime and the defendant. *Id.* at 341–42. The court noted that Vicky Williams, the leader of the plot to kill her husband, was sentenced only to life imprisonment. *Id.* at 341. Moreover, the Court noted that McIlvoy had a low IQ (81), a ninth-grade education, a minimal juvenile record and that, at the time of the murder, McIlvoy was under the influence of large amounts of alcohol and drugs that further diminished his subnormal intellect. *Id.* The Court also found facts in his favor that he turned himself in and waited dutifully for St. Louis police officers to pick him up in Dallas, Texas. *Id.* at 341–42.

Deck claims his case is comparable to *McIlvoy* because he, like McIlvoy, confessed to the crimes. Such a comparison is without merit, as the facts show that McIlvoy turned himself in and waited for the police to pick him up. Deck, however, was apprehended while attempting to hide evidence and gave two false alibis before he eventually confessed to the crime. *Id.* Additional distinguishing facts in this case are that Deck planned the robbery based on his knowledge of the victims, robbed the victims at gun point, forced them to the floor, deliberated for ten minutes and then shot them at point-blank range. *Deck I,* 994 S.W.2d at 531–32. Deck was the mastermind of his crime in contrast to McIlvoy, who was a weak follower.

The death sentences given Deck were neither excessive nor disproportionate.

## XII. Conclusion

For the foregoing reasons, the judgment and sentences of death are affirmed.

PRICE, C.J., and RUSSELL, J., concur; BRECKENRIDGE, J., concurs in part and concurs in result in separate opinion filed; STITH, J., concurs in result in separate opinion filed; WOLFF, J., concurs in opinion of STITH, J.; TEITELMAN, J., concurs in result only.

PATRICIA BRECKENRIDGE, Judge, concurring in part and concurring in result.

While I concur with the principal opinion's conclusion that the imposition of the death penalty on Carman L. Deck in this case was neither excessive nor disproportionate, I do not agree that the proportionality review under section 565.035, RSMo 2000, only requires review of factually similar cases that resulted in a death sentence. The legislature's directive in section 565.035.6 that records be compiled of "all cases in which the sentence of death or life imprisonment without probation or parole was imposed" clearly communicates its intent that factually similar cases with

sentences of life imprisonment be considered in the proportionality review. The fact that the legislature granted this Court discretion to determine what information from those two types of cases is relevant to conducting the mandated proportionality review does not indicate its intent that the Court should limit the review to only death-penalty-imposed cases. I believe that, as a matter of law, this Court does not have the discretion to eliminate from the proportionality review all cases in which the jury imposes the sentence of life imprisonment without the possibility of probation or parole.

The principal opinion states that the holding in *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993), that proportionality review only requires review of similar cases that resulted in a death sentence, was unanimous and has gone unquestioned by any member of this Court for 17 years. While the *Ramsey* decision was unanimous, it is noteworthy that the Court overturned prior case law *sub silentio* and adopted its new standard of proportionality review without any analysis or discussion of the language of section 565.035. *See, e.g., State v. Mallett*, 732 S.W.2d 527, 542–43 (Mo. banc 1987) ("The issue when determining the proportionality of a death sentence is not whether any similar case can be found in which the jury imposed a life sentence, but rather whether the death sentence is excessive or disproportionate in light of 'similar cases' as a whole."). I also am not persuaded that the legislature's failure to respond to the *Ramsey* decision should be interpreted as its approval of that decision. This Court recently has questioned such a conclusion: "An incorrect judicial interpretation of a statute may also stand simply because the legislature has paid no attention to it. Thus, it is speculative to infer legislative approval from legislative inaction." *Med. Shoppe Int'l, Inc. v. Dir. of Revenue*, 156 S.W.3d 333, 334 (Mo. banc 2005).

I am committed firmly to the principle of stare decisis but, where the issue being addressed is life or death, it is more important to correct a prior erroneous decision of the Court and to undertake the proportionality review as it is intended by the legislature.

I write separately from Judge Stith because of her additional criticism of the principal opinion's statement that the proportionality review in section 565.035.3 is intended for this Court to consider only whether the imposition of the death penalty was a "freakish or wanton application of the death penalty." She notes that the language "freakish or wanton" came from *Ramsey* and not from the statute. While such language is not found in section 565.035, I think the principal opinion is correct that the language of section 565.035.3 supports the conclusion that proportionality review is intended for this Court to identify and correct only the imposition of aberrant death sentences. I do not read the statute as requiring that the Court act as a super-juror by substituting its judgment of the appropriate punishment for that of the jury and the trial court. While the principal opinion would be served by better utilizing the statute's terms when discussing its review, its use of the language "freakish or wanton" does not indicate the Court is applying an incorrect standard or not undertaking the review required by section 565.035.3.

Although the principal opinion applied an erroneous standard in conducting its proportionality review, a review including similar cases where the jury imposed the sentence of life imprisonment without the possibility of probation or parole does not change this Court's conclusion that Mr. Deck is not entitled to relief. As Judge Stith demonstrates in her opinion concurring in result, the consideration of cases where a sentence of life imprisonment was

imposed would not change the finding that Mr. Deck's sentence was not disproportionate or excessive to the sentences imposed in similar cases. Accordingly, I concur in the result reached by the principal opinion in its proportionality review and concur in the remainder of the opinion.

LAURA DENVIR STITH, Judge, concurring in the result.

I concur in the result of the principal opinion but respectfully disagree with that portion of the opinion holding that proportionality review under section 565.035.3 RSMo 2000 requires this Court to review only other cases in which the death penalty was imposed under similar facts. Section 565.035 requires consideration of all "other similar cases," which includes those in which a life sentence resulted, in determining whether the sentence of death is excessive or disproportionate in light of the crime, the defendant and the strength of the evidence. To the extent that this Court's cases decided between 1994 and the present suggest otherwise, they are contrary to the statute and to cases decided under it from 1979 until 1993 and no longer should be followed.

## I. HISTORY OF PROPORTIONALITY REVIEW IN MISSOURI

### A. Until 1994, Review Was of Both Death and Life Imprisonment Cases

In *Gregg v. Georgia*, 428 U.S. 153, 197–199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court held that the death penalty is constitutional if not imposed arbitrarily and if procedural safeguards against improper imposition of the death penalty were followed. The Supreme Court noted that the Georgia death penalty procedures analyzed in *Gregg* met these requirements because, among other things, they compared "each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case

is not disproportionate." *Id.* at 198, 96 S.Ct. 2909.

In reliance on *Gregg*, Missouri's legislature re-enacted the death penalty in 1977. § 565.001 et seq., RSMo Supp.1977. Section 565.008.1 made persons convicted of capital murder eligible for one of two possible sentences—either death or life in prison without eligibility for probation or parole for 50 years. Section 565.014 also noted a right of direct appeal to this Court in all cases in which the death penalty was imposed and required that in all such cases:

> 3. With regard to the sentence, the supreme court shall determine:
>
> (1) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
>
> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance . . .
>
> (3) Whether the sentence of death is excessive or **disproportionate to the penalty imposed in similar cases,** considering both the crime and the defendant.

§ 565.014.3, RSMo Supp.1977 (emphasis added).

Missouri's legislature also required that, in conducting this proportionality analysis, *"the supreme court shall include in its decision a reference to those similar cases which it took into consideration."* § 565.014.5, RSMo 1977 (emphasis added). It provided this Court with an attorney assistant to accumulate "the records of *all capital cases* in which sentence was imposed after May 26, 1977, or such earlier date as the court may deem appropriate." § 565.014.6 (emphasis added). This assistant was directed to "provide the court with whatever extracted information the court desires with respect thereto." *Id.*

The first capital murder case in which this Court applied the proportionality analysis required by the Missouri legislature was *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981). The Court was clear at that time that the duty imposed on it by these provisions to review similar cases in deciding proportionality meant it was required to review all cases in which the death penalty was submitted, whether the sentence actually imposed was life imprisonment or death, stating:

> The records of all capital cases in which sentence was imposed after the effective date, accumulated pursuant to § 565.014.6, have been reviewed. *Those cases in which both death and life imprisonment were submitted to the jury, and which have been affirmed on appeal are considered as similar cases,* [section] 565.014.5.

*Mercer*, 618 S.W.2d at 11 (emphasis added).

Indeed, the only controversy at that time was whether the Court also should consider cases in which the death penalty was *not* sought but in which it *might have* been sought, with Judge Seiler arguing in dissent that:

> I do not agree that we discharge our duty under section 565.014.2(3) to determine "(w)hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases" by restricting our consideration to cases in which both death and life imprisonment were submitted to the jury and which have been affirmed on appeal. This is too limited in scope. It eliminates from consideration all cases in which the state waived the death penalty, all cases in which life imprisonment was given and no appeal taken, all capital cases pending before us [but not as of that time affirmed] in which life imprisonment was given, and all cases in which capital murder was charged but the jury found de-

fendant guilty of a lesser crime than capital murder.... The purpose of appellate review of the death penalty is to serve "as a check against the random or arbitrary imposition of the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It is our solemn duty, in my opinion, to guarantee that similar aggravating and mitigating circumstances do not bring about a death sentence in one case and life imprisonment in another.

*Mercer*, 618 S.W.2d at 20–21 (Seiler, J., dissenting).

The next year, this Court reaffirmed in *State v. Bolder*, 635 S.W.2d 673 (Mo. banc 1982), that "similar cases" included all cases in which the fact-finder was required to choose between death or life imprisonment, stating:

> Relevant cases for a review of the appropriateness of the sentence *are those in which the judge or jury* first found the defendant guilty of capital murder and *thereafter chose between death or life imprisonment* without the possibility of parole for at least fifty years.

*Id.* at 685 (emphasis added).

In 1983, the legislature modified the proportionality review statute to add the requirement that this Court consider "the strength of the evidence" in addition to the crime and the defendant as a part of its proportionality review. § 565.035.3, RSMo Supp.1983. And, importantly here, it revised section 565.035.6 so that instead of stating that the Court's assistant should accumulate the records of "all capital cases," the statute expressly required that records of both death and life imprisonment cases be accumulated for comparison purposes in determining what are similar cases, stating:

> The court shall accumulate the records *of all cases in which the sentence of death or life imprisonment without probation or parole was imposed* after [the

reinstitution of the death penalty on] May 26, 1977, or such earlier date as the court may deem appropriate.

§ 565.035.6, RSMo Supp.1983 (emphasis added).

The proportionality review statute has remained essentially unchanged in relevant respects since that time.[1] So too did this Court's approach to the proportionality analysis for the next decade. In case after case, this Court considered other cases with similar facts, regardless of whether the penalty imposed was death or life imprisonment.

For instance, *State v. Lashley*, 667 S.W.2d 712 (Mo. banc 1984), found that the imposition of the death penalty was not arbitrary in light of the entire record, after comparing the case to other "lying in wait" cases in which the choice of life imprisonment or the death penalty was submitted. *Id.* at 716. *Lashley* cited to *State v. McDonald*, 661 S.W.2d 497 (Mo. banc 1983), *overruled on other grounds by, State v. Barton*, 936 S.W.2d 781 (Mo. banc 1996), which had approved the death penalty in a "lying in wait" case after taking into account both the crime and the defendant, stating, "In arriving at this conclusion we have reviewed the cases decided since the enactment of our current capital murder statute ... where the death sentences were affirmed, one case which reversed the death sentence because of its disproportionality, and capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury." *McDonald*, 661 S.W.2d at 507.

Similarly, in *State v. Wilkins*, 736 S.W.2d 409, 417 (Mo. banc 1987), this

Court compared the defendant, his crime and the strength of the evidence to that in other cases in which life imprisonment had been imposed, as well as those in which death had been imposed, in finding that the death sentence was not disproportionate.[2]

Again, in *State v. Six*, 805 S.W.2d 159, 169 (Mo. banc 1991), this Court held that "for purposes of § 565.035.3(3), this Court has examined those capital murder and first degree murder cases in which death and the alternative sentence of life imprisonment have been submitted to the jury and the sentence has been affirmed on appeal."

*B. Beginning with Ramsey, this Court Strayed From a Proper Application of the Proportionality Review Required by Section 565.035*

Despite this long-settled interpretation of what constituted similar cases under section 565.035, in *State v. Ramsey*, 864 S.W.2d 320 (Mo. banc 1993), this Court began undertaking a different—and much more limited—proportionality review. *Ramsey* correctly noted that the United States Supreme Court had held, "Proportionality review is not constitutionally required. It is designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote the evenhanded, rational and consistent imposition of death sentences." *Id.* at 328, *citing Pulley v. Harris*, 465 U.S. 37, 47–48, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

*Pulley* held that the Eighth Amendment to the United States Constitution does not require that a court undertake a proportionality review. *Pulley*, 465 U.S. at 50–

1. Accordingly, all statutory references for the remainder of this opinion shall be to RSMo 2000, unless otherwise indicated.

2. The Court rejected the view of the three dissenting judges that the defendant's age—he

was a minor at the time of the offense—as well as his cognitive-emotional disorder and his extensive drug abuse made him categorically ineligible for the death penalty. *Id.* at 422–23.

51, 104 S.Ct. 871. It did not address, however, the kind of analysis that is required under Missouri's proportionality review statute. Nonetheless, without distinguishing or overruling any of this Court's many cases (including those noted above) stating that proportionality review requires consideration of all prior capital cases, regardless of whether a death sentence was imposed, *Ramsey* rejected what it called the argument that it should be "parsing through homicide cases" by examining and weighing different facts. 864 S.W.2d at 327. Rather, it said, section 565.035 proportionality review "merely provides a backstop against the freakish and wanton application of the death penalty.... If the case, taken as a whole, is plainly lacking circumstances consistent with those in similar cases in which the death penalty has been imposed, then a resentencing will be ordered." *Id.* at 328.

Although *Ramsey* briefly mentioned that cases imposing a life sentence "had been examined" and found to differ in regard to the presence of aggravating circumstances and the lack of mitigating ones, *id.*, it did not cite or discuss such cases. Thereafter, in reliance on *Ramsey*'s statement that the purpose of proportionality review is to provide a "backstop against the freakish and wanton application of the death penalty," *id.* at 328, with rare exceptions [3] this Court's cases began to compare the facts of the defendant's case against only other cases in which imposition of the death penalty had been approved. *See, e.g., State v. Parker,* 886 S.W.2d

908, 933–34 (Mo. banc 1994); *State v. Richardson,* 923 S.W.2d 301, 330 (Mo. banc 1996); *Lyons v. State,* 39 S.W.3d 32, 44 (Mo. banc 2001); *State v. Johnson,* 207 S.W.3d 24, 50–51 (Mo. banc 2006); *State v. Barton,* 240 S.W.3d 693, 709–11 (Mo. banc 2008).

Few of these cases actually analyze the language of section 565.035, however, or compare the analysis this Court undertakes to that required by the statute. Instead, they cite to the statement in *Ramsey* that the purpose of proportionality review is to protect against the freakish or wanton imposition of a death sentence and then note that prior cases have imposed death on similar facts so the death sentence is not disproportionate.

*C. Section 565.035 Requires Consideration of Both Death and Life Imprisonment Cases*

Section 565.035 does not permit this Court to limit its analysis to a determination whether imposition of the death penalty was "freakish or wanton," however. That language comes from *Ramsey,* which notes the minimum standard that is constitutionally required to be met in order to avoid the arbitrary imposition of the death penalty. I agree that this is the ultimate constitutional issue, but the statute sets out a more specific, and I believe more stringent, proportionality analysis: the Court is required to determine whether the sentence of death is excessive or disproportionate after considering similar cases in light of three factors—the crime, the defendant and the strength of the evidence. § 565.035.3.[4] Whether a death sen-

---

**3.** *See, e.g., State v. Shurn,* 866 S.W.2d 447, 467 (Mo. banc 1993) (without mentioning *Ramsey,* which had been decided just a few months earlier, the Court said it "examines capital murder and first degree murder cases in which the sentencer considers death and life imprisonment to determine whether the sentence is proportionate to other cases").

**4.** The principal opinion notes that *State v. Edwards,* 116 S.W.3d 511, 549 (Mo. banc 2003) (written by Stith, J.) states that this Court's role is, "to act as a safeguard by ensuring that a sentence of death is not imposed in a case in which to do so is freakish and disproportionate to the sentence given in similar cases considered as a whole." That statement is accurate, although to the extent

tence is imposed is not a listed factor. To the contrary, after stating that this Court is to list "those similar cases which it took into consideration," § 565.035.5, the statute requires that this Court appoint an assistant to "accumulate the records of all case in which the sentence of death *or life imprisonment* without probation or parole was imposed." § 565.035.6 (emphasis added).

It would be pointless for section 565.035.6 to require this Court to accumulate records of cases in which life imprisonment is imposed if life imprisonment cases are inherently dissimilar to this Court's proportionality review under the statute. That is why the cases interpreting section 565.035 and its predecessor prior to *Ramsey* considered both death and life imprisonment cases, for both may constitute "similar cases" under section 565.035.[5]

Although this type of proportionality review is required by statute, rather than by the Eighth Amendment, the duty is no less important. Cases in which a life sentence was imposed should be included in this Court's proportionality analysis. That is not to say that the existence of a large number of cases in which a death sentence was imposed on similar facts may not be more persuasive or that cases that did not compare the case before them to those in

which a life sentence was imposed reached the wrong result. Rather, the analysis simply is incomplete unless one also looks at cases in which life imprisonment resulted, and there is a risk that this lack of complete analysis, in the rare case, may have prevented this Court from identifying a case in which the death penalty was disproportionate when considered as against similar cases as a whole.

Further, it is worthwhile to note that United States Supreme Court Justice John Paul Stevens, in a statement respecting the denial of a petition for writ of certiorari in *Walker v. Georgia*, — U.S. —, — – —, 129 S.Ct. 453, 454–55, 172 L.Ed.2d 344 (2008), recently expressed concern about Georgia's current failure to consider cases in which a life sentence was imposed, stating that consideration of the latter cases seems "judicious because, quite obviously, a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court."

In *Walker*, the defendant argued that Georgia's capital punishment scheme was unconstitutionally arbitrary because it failed to conduct a meaningful proportionality review. Justice Stevens noted that this issue was not preserved properly;

---

that it could be read to suggest that this is the only analysis this Court must undertake, it would be incomplete. *Edwards* also quotes the portion of the statute requiring this Court to consider similar cases and to determine whether the sentence is proportionate to them in light of the crime, the defendant and the strength of the evidence, however. It also notes that under the statute this Court's duty is to examine similar cases as a whole, not to simply identify a single similar case in which a particular sentence was imposed, and then examines similar cases in which either a death sentence or a sentence of life imprisonment was imposed, before determining that the death sentence is not disproportionate.

5. The principal opinion notes that the legislature has not changed section 565.035 since *Ramsey* was decided over 16 years ago and therefore must approve of *Ramsey*'s decision not to consider similar cases that resulted in a sentence of life imprisonment. I would note that the legislature also did not change section 565.035 during the more than 14 years that this Court interpreted that section to require consideration of similar cases that resulted in either death or life in prison without parole. Indeed, since the statute unambiguously has required consideration of both types of cases, if similar, for all 30 years since it was enacted, there would be no reason for it to change; it is this Court's recent jurisprudence which is incorrect.

therefore, he concurred in the denial of certiorari but said, "I write separately to emphasize that the Court's denial has no precedential effect." *Id.* at 454. The reason he wanted to emphasize this point, he said, was his concern that *Gregg* and similar cases had affirmed the lack of arbitrariness of Georgia's death penalty procedures partly in reliance on Georgia's statutory requirement that its supreme court independently review the imposition of the death penalty and its proportionality to similar cases in which death or a life sentence without parole had been imposed. *Id.* at 454.

Justice Stevens noted there is a "special risk of arbitrariness" in cases in which the victim and defendant are of different races, such as in *Walker;* therefore, it greatly troubled him that Georgia had carried out only a "perfunctory" proportionality review and had not considered cases in which death was not imposed, despite the heightened risk of arbitrariness, stating, "had the Georgia Supreme Court looked outside the universe of cases in which the jury imposed a death sentence, it would have found numerous cases involving offenses very similar to petitioner's in which the jury imposed a sentence of life imprisonment." *Id.* at 455–56.

Justice Stevens further found such cases to be "eminently relevant to the question whether a death sentence in a given case is proportionate to the offense," *id.* at 456, and that, "failure to acknowledge . . . cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that [the reviewing court] will overlook a sentence infected by impermissible considerations." *Id.* In other words, if one limits one's consideration only to cases in which a

similar penalty was imposed, then it is almost preordained that the cases will be found to be similar, but this says nothing about whether the case also is similar to cases outside the orbit of the court's analysis.

While it is unclear whether the other justices share Justice Stevens' viewpoint, the concern he raises is a realistic one that, by categorically refusing to look at cases in which a life sentence was imposed, a court may be excluding from consideration cases that are in fact similar to the one before it. It therefore is not surprising that Missouri's legislature expressed its intent that cases in which a life sentence was imposed are to be a part of this Court's proportionality review.

Such a review does not impose a new requirement on this Court to count good and bad facts or to become a super-juror and second-guess the jury's consideration of the evidence. Such a review requires the Court only to continue doing what it now does in regard to cases in which death was imposed—review them to determine whether the sentence of death is disproportionate in light of the crime, the defendant and the strength of the evidence, *see, e.g., State v. Chaney,* 967 S.W.2d 47, 59–60 (Mo. banc 1998) (finding death sentence disproportionate in light of strength of the evidence after comparing to other death cases)—but to include similar cases in which a life sentence was imposed in that analysis. *See, e.g., State v. McIlvoy,* 629 S.W.2d 333, 341–42 (Mo. banc 1982) (finding death sentence disproportionate to the penalty imposed in similar cases after considering both death and life sentence cases). The Court now simply must apply its already existing analysis to the broader universe of cases required by statute—those in which either death or a sentence of life without parole were imposed.[6]

---

**6.** I agree with the principal opinion that the statute simply requires the Court to gather information about all of these cases and that it leaves to the Court the discretion to determine which of these constitute similar cases to which the current case should be compared. If the Court exercised such discretion

The principal opinion already considers similar cases in which a death penalty resulted. Therefore, this separate opinion determines whether the death sentence here is disproportionate in light of similar cases by additionally reviewing the cases Mr. Deck cites as similar but in which a life sentence was imposed, and also by reviewing other cases in which a life sentence was imposed that also involved multiple murders during the course of a robbery or burglary.

## II. PROPORTIONALITY REVIEW

The facts of Mr. Deck's case are chilling. He and his mother's boyfriend originally decided to rob the home of an older couple, James and Zelma Long, while the couple was at church. But because they wanted the money sooner for a trip, Mr. Deck and his sister went to the Longs' rural home in DeSoto, Missouri, on a weekday night. After gaining entry through a ruse, Mr. Deck pulled a pistol from his waistband and ordered the Longs to lie face down on their bed. They did so. Mrs. Long opened their home safe and gave Mr. Deck the paper and jewelry inside as well as $200 from her purse and additional cash in the house. Mr. Deck then forced the Longs to lie back down while he stood at the foot of the bed trying to decide what to do for ten minutes, as they begged for their lives. When his sister got tired of acting as a lookout and left the house for the car, he put the gun to Mr. Long's head and shot him twice, then did the same to Mrs. Long. Neither survived. During the penalty phase of the trial, the Longs' son read a statement the family had prepared addressing the impact of the deaths on their family.

Mr. Deck offered mitigation evidence that it was not a planned murder, that he made a "lousy" decision while scared and nervous, and that he confessed and cooperated with police. As the majority notes, he presented additional mitigation evidence, which in a prior case was described this way:

> The defense presented substantial evidence concerning the abuse Mr. Deck suffered as a child, the lack of parental love and his continual move from one foster home to another. It presented evidence that, despite all this, he continued to love and care for his younger siblings, scrounging for food for them and bathing them while his mother was out at clubs or with boyfriends. It showed how the Pucketts wanted to adopt him and give him a chance to grow up in a loving family, but he was instead returned to his mother and further abuse.

*Deck v. State*, 68 S.W.3d 418, 430 (Mo. banc 2002). He also presented expert evidence in this trial as to the effect of his difficult childhood, evidence which the jury heard and considered before deciding to impose the death penalty, as had the 24 jurors in his two prior penalty-phase trials.

The jury found six aggravators—that each murder was committed while the defendant was engaged in the commission of another homicide; that the murders were committed for the purpose of receiving money or any other thing of monetary value; that the murders were outrageously and wantonly vile, horrible and inhuman in that they involved depravity of mind; that they were committed for the purpose of avoiding a lawful arrest; that they were

---

when it found similar life sentence cases, then it would be fulfilling its statutory duty, and, in fact, in the past it has done this *sub silencio*. But *Ramsey* itself says, and the principal opinion nominally appears to affirm, that cases in which a life sentence was imposed are cate- gorically dissimilar and so will not be examined. That is not an exercise of discretion but a refusal to exercise it and makes the statutory requirement to gather life sentence cases pointless.

committed while the defendant was engaged in the perpetration of a burglary; and that they were committed while the defendant was engaged in the perpetration of a robbery.

Mr. Deck argues the facts were insufficient to support imposition of the death penalty because persons in other cases with similar facts were sentenced to life in prison. He relies most heavily on *State v. Dulany*, 781 S.W.2d 52 (Mo. banc 1989), and *Conn v. State*, 769 S.W.2d 822 (Mo. App.1989). Mr. Conn and his girlfriend, Ms. Dulaney, acted together to rob and murder Mr. Conn's aunt and uncle, possibly because his aunt and uncle had refused to loan him money for bail. In *Conn*, although the State had announced its intent to seek the death penalty, the State and defendant reached a plea agreement of a life sentence, and a jury never heard the case. 769 S.W.2d at 823–24. This Court always has held that cases in which the State agrees not to seek the death penalty are not considered in the proportionality analysis. *See, e.g., State v. Mercer*, 618 S.W.2d at 11.

*Dulany* did go to trial. But the State had no direct evidence that Ms. Dulaney actually committed the murders, and she testified that she merely assisted Mr. Conn, who actually murdered both victims. The State argued, therefore, that she should be found guilty either as the perpetrator or as an accomplice to Mr. Conn. 781 S.W.2d at 53–55. The jury may have found that Ms. Dulaney acted only as an accomplice to her boyfriend, particularly in light of the evidence of her dependence on him. By contrast, in *Deck* the evidence is not ambiguous as to who directly killed the victims. Mr. Deck was the mastermind; he committed the two murders himself—his role is like that of Mr. Conn, not of Ms. Dulaney.

Mr. Deck also relies on *State v. Owens*, 827 S.W.2d 226 (Mo.App.1991), in which the defendant was convicted of two counts of first-degree murder for shooting two persons during the course of a burglary yet received a life sentence. *Id.* at 227. While both cases involve multiple murders in the course of a robbery, there were five co-conspirators in *Owens*, three of whom pleaded guilty and blamed the murders on the defendant. *Id.* at 232. The jury may have found that testimony self-serving and not credible in light of their plea agreements. Further, a jury deadlocked as to the fifth defendant, and the court imposed a death sentence. *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988).

The remaining cases Mr. Deck cites in support of his argument are substantially factually disparate from Mr. Deck's case. *See State v. Merrill*, 990 S.W.2d 166 (Mo. App.1999) (conviction was based largely on testimony of girl who was four years old at time of murders); *State v. Holcomb*, 956 S.W.2d 286 (Mo.App.1997) (murders did not take place in the course of a robbery); *State v. Futo*, 932 S.W.2d 808 (Mo.App. 1996) (same); *State v. Clark*, 859 S.W.2d 782 (Mo.App.1993) (same).

Although Mr. Deck does not cite to them, consideration also has been given to other cases in which multiple murders were committed during the course of a robbery or burglary but in which the jury decided to impose a life sentence. In most of these cases, multiple persons were involved in the crimes, each of whom either denied involvement or claimed that their co-defendants were the ones who actually killed the victims. In such circumstances, the jury might well have concluded that the defendant was involved in the crime but that the evidence was unclear whether the defendant personally caused the death or acted merely as an accomplice.

This is an important distinction from Mr. Deck, who clearly was the mastermind of the crime and admits committing the

murders himself. *Compare State v. Downs,* 593 S.W.2d 535 (Mo. banc 1980) (youthful defendant without priors denied involvement, and statements of co-defendants sometimes implicated him but at other times inconsistently implicated others as actually committing murders in the course of robbery); *State v. Harper,* 713 S.W.2d 7 (Mo.App.1986) (credibility of co-defendant who claimed defendant actually shot victims during home robbery undermined by plea deal he made in return for his testimony; testimony of surviving victim identifying defendant arguably was inconsistent with co-defendant's testimony that defendant just shot once and unsure if hit anyone, and defendant strongly argued credibility issues); *State v. Jennings,* 815 S.W.2d 434 (Mo.App.1991) (multiple co-conspirators pointed fingers at each other as actual killers in multiple homicide store robbery). *See also State v. Clark,* 711 S.W.2d 928 (Mo.App.1986) (19-year-old defendant did not confess to the crime and presented evidence that one of two murders occurred during a struggle for his gun in a robbery gone wrong and that he had a two-year-old daughter).

While these cases in which a life sentence was imposed are comparable in some ways to Mr. Deck's case, they differ from it in important respects in regard to the age of the defendant, the strength of the evidence and whether the defendant actually committed the murder or acted as an accomplice. It is also appropriate to consider that Mr. Deck admitted committing a multiple homicide after deliberating over the victims and placing them in fear for 10 minutes, that he did so to hide his crime in the course of a robbery, and that the jury found his conduct vile and outrageous. As noted by the principal opinion, there are many cases in which a person has received a death sentence when the crime involved multiple murders during the course of a robbery and, as here, involved acts of brutality and showed depravity of mind, or

was committed to avoid detection or arrest. *See also Deck,* 136 S.W.3d at 490; *Deck,* 994 S.W.2d at 545.

For all of these reasons, while I believe the principal opinion errs in failing to consider similar cases in which a life sentence was imposed, I conclude that consideration of these cases would not change the result and that imposition of the death penalty is not disproportionate or excessive to the sentence imposed in similar cases.